APPLE GLEN CROSSING, LLC, Apple Glen Investors, LP, Bobeck Real Estate Company, Inc. and H. Duane Bobeck, Appellants (Plaintiffs Below),

v.

TRADEMARK RETAIL, INC., Apple Glen Crossing, LLC, and Terry Montesi, Individually, Appellees (Defendants Below).

No. 02S05–0207–CV–397.

Supreme Court of Indiana.

March 7, 2003.

Gene R. Leeuw, John M. Mead, Indianapolis, IN, Attorneys for Appellants.

Edward L. Murphy, Jr., Diane C. Bauer, Fort Wayne, IN, Attorneys for Appellees.

BOEHM, Justice.

Apple Glen Crossing is a shopping center developed by a limited liability company whose minority member also served as manager of the LLC under the LLC's Operating Agreement. The LLC and its majority member attempted to remove the manager, claiming the manager breached the Operating Agreement by incurring obligations to contractors without prior approval. The trial court in this case granted the manager's request for a preliminary injunction preventing its removal. The court, in part, reasoned that once the LLC ordered the obligations paid, the alleged breach of the Operating Agreement was "cured" and the LLC no longer had the power to remove the manager. We granted transfer in this case to reaffirm the longstanding rule that a principal who honors an obligation wrongfully incurred by its agent may nevertheless enforce its remedies against the agent for the wrongful action. However, for different reasons, we affirm the trial court's grant of the preliminary injunction and remand this case for further proceedings.

### Factual and Procedural Background

Apple Glen Investors, LP (AGI) is an Indiana limited partnership that, until 1998, was the sole owner of a piece of undeveloped real estate in Fort Wayne. In May of that year, AGI teamed up with a Texas corporation, Trademark Retail, Inc., to form a limited liability company, Apple Glen Crossing, LLC, organized under the Indiana Business Flexibility Act. The purpose of the LLC was to develop the property into a shopping center now known as Apple Glen Crossing. AGI became the majority (65%) member of the LLC, and the parties entered into an "Operating Agreement"[1] that provided for Trademark to become the sole "manager."[2]

---

**1.** "Operating agreement" of a limited liability company is defined by the Indiana Code as "any written or oral agreement of the members as to the affairs of a limited liability company and the conduct of its business that is binding upon all the members." Ind.Code § 23–18–1–16 (1994).

**2.** The Act contemplates a "manager" if the Articles of Organization so provide. Ind.Code § 23–18–1–14. In practical terms, AGI's ap-

proval was required for all Major Decisions. This type of restraint on the actions of an LLC manager is contemplated by Indiana Code section 23–18–4–1(b), which states: "If the articles of organization provide for a manager ..., *except to the extent that the operating agreement reserves the authority to any members ...*, the manager ... [has] the authority to manage the business or affairs of the limited liability company." (Emphasis added.) *See also* I.C. § 23–18–4–5 ("Members may

Under the Operating Agreement, Trademark could make "Major Decisions" only with unanimous approval of the "Members." Among the actions defined by the agreement to be a Major Decision was the "[e]ntering into or amending any contract ... where the payments to be made ... are reasonably anticipated to exceed $10,000 in any one calendar year." The agreement also spelled out the procedure for obtaining approval of Major Decisions: (1) Trademark was to give AGI notice of its recommendation; (2) AGI then had five days after receiving the notice to object to Trademark's recommended course of action; and (3) if no timely objection was made, Trademark's recommendation was deemed approved. In addition, a separate Development, Marketing and Management Agreement ("Management Agreement") entered into between Trademark and the LLC stated: "[Trademark] shall assist [the LLC] and/or [the LLC's] Architect in preparing change orders for the Project, but no change order exceeding $5,000 could be made without [the LLC's] consent." The parties dispute the meaning of "change orders," an issue more fully discussed in Part III. The term is not defined in the Management Agreement but also appears in the contract between the LLC and Irmscher, Inc., the contractor hired to construct Apple Glen Crossing.

In the ordinary course of construction at Apple Glen Crossing, Trademark only occasionally provided AGI with copies of the change orders submitted by Irmscher for payment, and AGI neither expressly approved nor objected to the change orders it received. The result was that much of the construction went forward with only Trademark's specific approval, but without any objection from AGI. That changed on September 12, 2000, when counsel for AGI sent a letter to the Executive Vice President of Trademark objecting to change orders it had received apparently on September 6.[3] That letter stated:

Trademark's request for Apple Glen Investors' consent to Change Orders 39, 43, and 46–52 that was submitted by T.C. Beardslee on behalf of Trademark was received on September 6, 2000, by Apple Glen Investors while Duane Bobeck [president of AGI's general partner, Bobeck Real Estate] was out of the country as you well know. Apple Glen Investors objects to and withholds its consent from the proposed changes.

The documents you submitted indicate these change orders were already approved by Trademark. Because Trademark was not authorized to undertake this action without the unanimous agreement of the members of Apple Glen Crossing, Trademark has again breached the Operating Agreement. Furthermore, Trademark has failed to provide sufficient information to Apple Glen Investors in order for it to make a determination on the propriety or necessity of these changes had the request been properly and timely submitted.

On the basis of these facts, Apple Glen Investors withholds it[s] consent

---

enter into an operating agreement to regulate or establish any aspect of the affairs of the limited liability company or the relations of the members and managers, if any, including provisions establishing ... [t]he manner in which the business and affairs of the limited liability company shall be managed....").

**3.** According to the letter, AGI appears to have sent its objection six days after receiving notice of Trademark's action, one day after the five days required under the terms of the Operating Agreement. Trademark has not argued in the trial court or on appeal that AGI's objection was too late, instead focusing on whether AGI provided enough time to cure the alleged defect, and the issue, if there is one, is therefore waived.

and objects to Change Orders 39, 43, and 46–52.[4]

Although AGI objected to the change orders, it later directed Trademark to pay them.

On September 15, 2000, AGI's counsel sent a second letter to Trademark stating that "[b]ased on the events of default detailed in my letter to you of September 12, 2000, Trademark Retail, Inc. is hereby notified by Apple Glen Investors, L.P. that as of today Trademark is removed as manager of Apple Glen Crossing, LLC." AGI also purported to terminate both the LLC Operating Agreement and the Management Agreement between the LLC and Trademark.

At a meeting of the LLC members on October 18, 2000, AGI voted to "acknowledge and approve" the removal of Trademark as manager of the LLC and appoint itself as manager. However, the records of the project remained at Trademark's office in Texas and Trademark continued to hold itself out as the manager of the LLC. On October 26, 2000, AGI filed a complaint against Trademark in Allen Circuit Court essentially seeking to enforce its decision to discharge Trademark as manager of the LLC. On November 7, 2000, Trademark filed its own separate complaint in Allen Superior Court seeking, in part, a preliminary injunction enjoining AGI from removing Trademark as manager. Those cases were consolidated in Superior Court and on December 22, 2000, AGI moved for a preliminary injunction against Trademark's continuing to act as

manager of the LLC. After a three-day hearing, the trial court concluded that "AGI's removal of Trademark [in the September 15, 2000, letter] was void" because AGI did not give Trademark the 15 days required under the Operating Agreement or the 30 days under the Management Agreement to cure any default. The trial court also held that "[s]ince the change orders were paid at the direction of AGI . . ., the Event of Default has been cured and cannot form a legal basis for removing Trademark as manager of the LLC, or of the shopping center."[5] The Court of Appeals agreed with this reasoning. *Apple Glen Crossing, L.L.C. v. Trademark Retail, Inc.*, 760 N.E.2d 1109, 1117 (Ind.Ct. App.2001).

## I. Standard of Review

▅▅▅▅ The grant or denial of a preliminary injunction rests within the sound discretion of the trial court, and our review is limited to whether there was a clear abuse of that discretion. *Ind. Family & Soc. Servs. Admin. v. Walgreen Co.*, 769 N.E.2d 158, 161 (Ind.2002). To obtain a preliminary injunction, the moving party has the burden of showing by a preponderance of the evidence that: (1) the movant's remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action; (2) the movant has at least a reasonable likelihood of success at trial by establishing a prima facie case; (3) threatened injury to the movant outweighs the potential harm to the nonmoving party resulting from the granting of an injunction; and (4) the public interest would not be disserved. *Id.* If the movant fails to

---

4. Those change orders were for the following amounts: number 39 ($74,077.50); number 43 ($110,324.50), number 46 ($63,225.36), number 47 ($3,832.95); number 48 ($14,025); number 49 ($22,110); number 50 ($19,338); number 51 (minus $1,726.45); and number 52 (minus $9,960.72).

5. The trial court also addressed other "events of default" raised by AGI, but found that (1) they were not the basis upon which Trademark was purportedly removed by AGI's September 15 letter, and (2) AGI's other complaints were raised well after the time for objection had passed. We agree with those conclusions.

prove any of these requirements, the trial court's grant of an injunction is an abuse of discretion. *Id.*

## II. An Agent's Liability to its Principal

■ We agree with the Court of Appeals that the trial court's enjoining the removal of Trademark as manager was within its discretion. However, as to the issue of Trademark's "reasonable likelihood of success at trial," we disagree with the trial court's and the Court of Appeals' reasoning. Specifically, we hold that a principal's paying an obligation improperly incurred on its behalf by its agent does not constitute a waiver of the principal's objection to the agent's action or bar the principal's claims against the agent. Therefore, Trademark will not succeed at trial by claiming it could not be fired as manager after the LLC ordered the objectionable change orders paid. However, we agree with Trademark's contention that its approving the "change orders" objected to by the LLC did not constitute a "Major Decision" as that term is defined by the Operating Agreement, and therefore gave the LLC no grounds to remove Trademark as manager.

■ An Indiana LLC is expressly authorized to outline in an "operating agreement" provisions defining the authority of its "manager." *See* Ind.Code § 23–18–4–1(b); *id.* § 23–18–4–4. The LLC's Operating Agreement named Trademark as the LLC's manager and included provisions modifying the ordinary power of a principal "to revoke an agent's authority at any time." 1 *Indiana Law Encyclopedia,*

Agency § 7, at 456 (2002). Under that agreement, Trademark could be terminated for an "Event of Default" only if the default was not cured within 15 days after notice from the LLC specifying the event.[6] The parties agree that the September 12, 2000, letter constituted notice of a claimed "Event of Default," although they disagree as to whether Trademark actually was in default.

Trademark acted as manager of the LLC, and as such was an agent of the LLC. The trial court held that any "Event of Default" allegedly caused by Trademark's approving change orders 39, 43, and 46–52 was cured by the LLC's subsequently ordering Trademark to pay them. This decision was presumably grounded in the notion that a principal may be estopped from alleging the illegality of an agent's acts when the principal ratifies those acts. *Id.* § 13, at 466.

■ As this Court stated in *Koval v. Simon Telelect, Inc.*, 693 N.E.2d 1299, 1304 (Ind.1998), a principal is bound by the acts of a general agent if the agent acted within the usual and ordinary scope of the business in which it was employed, even if the agent may have violated the private instructions the principal may have given it.[7] *See also* 3 Am.Jur.2d *Agency* § 73, at 487 (2002) ("An agent has the implied authority to do business on the principal's behalf in accordance with the general custom, usage, and procedures in that business."). Whether or not Trademark was in default of the Operating Agreement by unilaterally authorizing the change orders, unless Irmscher was on notice of the limit-

---

**6.** "Event of Default" is defined as "[t]he failure to observe or comply with any provision or covenant in this Agreement or the [Management] Agreement, and such default is not cured within 15 days of the date Notice of such default is given, which Notice shall spec- ify with reasonable particularity the basis for the default claimed."

**7.** The principal's obligation to the third party is also predicated on the third party's ignorance that the agent was exceeding its authority. *Koval*, 693 N.E.2d at 1304.

ed authority,[8] the LLC was obligated to pay Irmscher for the work already authorized by Trademark as the LLC's agent. But to the extent the trial court concluded payment to Irmscher effected a "cure" of any unauthorized payment, we disagree. It is well established that an agent who wrongfully binds its principal may be subject to termination and may also remain liable to the principal in accordance with the terms of their agreement, despite the principal's obligation to the third party. Harold Gill Reuschlein and William A. Gregory, *Agency and Partnership* § 81, at 133–34 ("If ... the principal was compelled to ratify ... to protect his own interests the agent is not relieved of liability.... Even though the ratification ... operates to relieve the agent of liability for damages, the breach ... by the agent stands and the principal still retains his right to discharge the agent."); *Restatement (Second) of Agency* § 101(b) (1958) (ratification of the unauthorized action does not preclude a claim against the agent if the ratification is necessary "to protect ... [the principal's] interests."). We need not address the issue of the agent's liability for damages here. For our purposes today the point is that the LLC's honoring its obligation to Irmscher cannot be considered a "cure" of Trademark's alleged default that precludes Trademark's removal.

### III. The Effect of Approving Change Orders

The trial court defined "change orders" as "requests for construction work payments." At oral argument, counsel for Trademark expanded on the trial court's definition by stating that the change orders were essentially invoices of work ac-

tually completed by Irmscher, and not the "entering into or amending of" a contract, i.e., not a "Major Decision." This seems essentially correct.

■ The term "change orders" was used in the construction contract with Irmscher in a variety of ways. On some occasions, the term was used in the traditional sense as the means by which the LLC, if it chose, could order Irmscher to change the project itself, its lump sum cost, or the contract's time schedule. When used in this manner, it is easy to see how the change orders would constitute amendments to the construction contract with Irmscher that would need LLC approval. In fact, the change order forms submitted by Irmscher for payment stated: "The said Contract as hereby amended shall remain in full force and effect."

However, the construction contract also provided a different use for these documents entitled "change order." When it came to the cost of construction, the contract estimated "Lump Sum Amounts" (termed "allowances") the LLC could expect to pay for various parts of the project. The costs actually incurred were represented by a succession of "change orders" that Irmscher submitted to Trademark, as manager of the LLC, for payment. For example, a change order would state the "original project costs" as "$0," state the amounts charged by the previous "change orders" (e.g., $6,429,928.26), the amount charged under the current change order (e.g., $3,484.50), and the total cost of the project to date ($6,433,412.76). The effect of this is that what a change order termed a "project cost adjustment" was merely a tally of the costs incurred since the previ-

---

8. "Where a third party knows, or should know, that an agent is exceeding his or her authority, the principal will not be bound." 1 *Indiana Law Encyclopedia*, Agency § 21, at

475 (2002) (citing *Prairie Heights Educ. v. Bd. of Sch. Trustees of Prairie Heights Cmty. Sch. Corp.*, 585 N.E.2d 289 (Ind.Ct.App.1992)).

ous change order and a running total of all the costs to date, and not necessarily a change in anything originally agreed to by the LLC or Irmscher. This was the pricing mechanism contemplated by the construction contract, which stated: "The Lump Sum price for the Project is to be determined by change order to this contract." "Change orders" could also account for a cost reduction, as reflected in change order 51, which reflected a negotiated price reduction of $1,569.50 from earlier project costs.

The "change orders" objected to by the LLC were in this latter category and amounted to requests for progress payments. Their net effect was not the "entering into" of a new construction contract or "amending" the original contract with Irmscher. Rather, these documents appear to be in substance, as Trademark's counsel put it, invoices to be paid pursuant to pricing already contemplated by the contract for various stages of Irmscher's work. As such, Trademark's approval of these amounts did not constitute "Major Decisions" under the contract. Therefore, we agree with the trial court's conclusions that (1) the LLC's letter of September 12, 2000, stated no basis upon which it could properly terminate Trademark; and (2) Trademark has demonstrated a reasonable likelihood of success at trial.

### Conclusion

We affirm the trial court's grant of a preliminary injunction enjoining the removal of Trademark as manager of the LLC, and remand this case for further proceedings.

SHEPARD, C.J., and DICKSON, SULLIVAN, and RUCKER, JJ., concur.