## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 03 2016, 5:36 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Andrew M. McNeil
Bryan H. Babb
Mark A. Wohlford
Bose McKinney & Evans LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

David R. Pruitt
Brian E. Casey
Barnes & Thornburg LLP
South Bend, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Momar, Inc.,

*Appellant-Defendant,*

v.

Watcon, Inc.,

*Appellee-Plaintiff.*

November 3, 2016

Court of Appeals Case No.
71A03-1603-PL-621

Appeal from the St. Joseph Superior Court.
The Honorable Steven L. Hostetler, Judge.
Cause No. 71D07-1510-PL-353

## Friedlander, Senior Judge

[1] In this companion case to *Michael Janowiak v. Watcon, Inc.*, No. 71A04-1512-PL-2154 (Ind. Ct. App. August 11, 2016), Momar, Inc. appeals the trial court's grant of a preliminary injunction enjoining it from aiding its employee, Michael Janowiak, in soliciting orders from customers of Watcon, Inc., Janowiak's previous employer; from accepting orders from Watcon customers whose

business Momar had previously solicited with aid from Janowiak; and from using or divulging any of Watcon's confidential information. Concluding that the grant of the preliminary injunction was proper, we affirm.

[2] Momar presents three issues for our review, which we consolidate, reorder, and restate as:

1. Whether the trial court erred in determining that Watcon was entitled to a preliminary injunction.
2. Whether the trial court erred in fashioning the terms of its preliminary injunction order.

[3] Watcon, Inc. is a company headquartered in South Bend that provides water treatment services and related products for industrial, commercial, and institutional customers. In late 1988, Janowiak began working for Watcon as a field engineer, providing sales and service to Watcon customers. On December 1, 1988, Janowiak and George Resnik, as President of Watcon, entered into a contract (the Agreement) which contains clauses regarding non-competition, confidentiality, and non-solicitation. Janowiak worked for Watcon from 1988 to September 1, 2015, with access to its customer list, customer contact information, customer order history, and price lists. He was also one of Watcon's most successful sales representatives, acquiring new accounts and increasing his sales each year.

[4] On September 1, 2015, Janowiak tendered to Watcon a letter stating that he was terminating the Agreement between the two parties effective, September 15, 2015; however, the Agreement was terminated prior to that date. On

September 8, 2015, Janowiak signed a Sales Employment Agreement with Momar, Inc., a Georgia corporation with a water treatment division called Aquatrol. Although executed on September 8, the agreement states that Janowiak's employment commenced on September 1, 2015. Prior to hiring Janowiak, Momar was not selling Aquatrol products in the territory in which Janowiak had sold Watcon products. Upon commencing employment with Momar, Janowiak solicited business from some of his Watcon customers and sold to them Aquatrol products and services that directly compete with those of Watcon.

[5] On October 16, 2015, Watcon filed a complaint against Janowiak for damages, preliminary injunction, and permanent injunction. A hearing was held on Watcon's request for a preliminary injunction on November 16, 2015. The parties submitted proposed findings and conclusions, and, on November 24, 2015, the court issued findings of fact and conclusions granting a preliminary injunction in favor of Watcon.

[6] After learning that Momar was continuing to sell to and service Watcon customers, Watcon filed an amended complaint and added Momar as a defendant in January 2016. In addition, Watcon filed a motion to show cause, or, in the alternative, a motion to modify the preliminary injunction to also enjoin Momar. The trial court held a hearing on Watcon's motion on March 17, 2016. On March 21, 2016, the court issued its order modifying the

preliminary injunction issued against Janowiak, by extending it to also enjoin Momar.[1] This appeal ensued.

# 1.  Requirements of Preliminary Injunction

[7]  The grant or denial of a preliminary injunction rests within the sound discretion of the trial court, and appellate review is limited to whether there was a clear abuse of that discretion. *Apple Glen Crossing, LLC v. Trademark Retail, Inc.*, 784 N.E.2d 484 (Ind. 2003).  In granting or refusing a preliminary injunction, the trial court is required to make special findings of fact and state its conclusions thereon. *Barlow v. Sipes*, 744 N.E.2d 1 (Ind. Ct. App. 2001), *trans. denied*; Ind. Trial Rule 52(A).  On appeal, we must determine if the findings support the judgment. *Barlow*, 744 N.E.2d 1.  The findings or judgment shall not be set aside unless clearly erroneous.  T.R. 52(A).  Findings of fact are clearly erroneous when the record lacks evidence or reasonable inferences from the evidence to support them. *Barlow*, 744 N.E.2d 1.  A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *Gleeson v. Preferred Sourcing, LLC*, 883 N.E.2d 164 (Ind. Ct. App. 2008).  Due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.  T.R. 52(A).  On appellate review, we consider the evidence only in the light most favorable to the judgment and

---

[1] In its order, the trial court incorporated by reference all of the findings of fact it made in its November 24, 2015 preliminary injunction order. *See* Appellant's App. p. 105.

construe findings together liberally in favor of the judgment. *Barlow*, 744 N.E.2d 1.

[8] To obtain a preliminary injunction, the moving party has the burden of showing by a preponderance of the evidence: (1) a reasonable likelihood of success at trial; (2) the remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action; (3) the threatened harm to the moving party outweighs the potential harm to the nonmoving party from the granting of an injunction; and (4) the requested relief is not contrary to the public interest. *Apple Glen Crossing, LLC*, 784 N.E.2d 484. If the movant fails to prove any of these requirements, the trial court's grant of an injunction is an abuse of discretion. *Id.* On appeal, Momar challenges the trial court's determination that Watcon satisfied all four requirements for a preliminary injunction to issue.

# A. Likelihood of Success at Trial

[9] Covenants not to compete are in restraint of trade and are not favored by the law. *Gleeson*, 883 N.E.2d 164. These covenants are strictly construed against the employer and are enforced only if reasonable. *Id.* To be reasonable, the agreement's covenants (1) must protect legitimate interests of the employer and (2) must contain reasonable terms with regard to time, geography, and types of prohibited activity. *Id.*

[10] Momar does not dispute the trial court's determination that Watcon has legitimate interests worthy of protection; therefore, we proceed to the second

factor affecting the reasonableness of the Agreement. In that regard, Momar contends that the Agreement's terms concerning geography and type of prohibited activity in paragraph 9 are overbroad and unreasonable. Paragraph 9 of the Agreement provides:

> 9. The obligations imposed upon the Seller by Paragraph 2, and clause (A) of Paragraph 3 above, shall continue in effect regardless of the means or circumstances by which either this agreement or the active solicitation of orders in such territory may be terminated. For a period of two (2) years after the termination of this agreement, by mutual consent or otherwise, the Seller promises that *he will not, directly or indirectly, solicit orders from the users of the Companys' [sic] products in said territory*, provided that, if the applicable law of such territory fixes a shorter period of restraint, such shorter applicable statutory limitation shall be deemed to fix the maximum limit of such restraint.

Appellant's App. p. 78 (emphasis added).

[11]  First, Momar claims that paragraph 9 is overbroad as to its geographic limitation because it extends to all Watcon customers in Janowiak's territory, even those with whom Janowiak did not have a relationship. For instance, the University of Notre Dame and the City of South Bend were Watcon customers located in Janowiak's territory, but they were serviced by a Watcon account representative other than Janowiak. Momar suggests, for that reason, the covenant is unenforceable.

[12]  "A covenant not to compete must be sufficiently specific in scope to coincide with only the legitimate interests of the employer and to allow the employee a clear understanding of what conduct is prohibited." *Field v. Alexander &*

*Alexander of Ind., Inc.*, 503 N.E.2d 627, 635 (Ind. Ct. App. 1987), *trans. denied.* One accepted method of limiting a covenant's scope is to impose territorial or geographic boundaries. *Id.* In addition, our courts have also recognized that "as the specificity of limitation regarding the class of person with whom contact is prohibited increases, the need for limitation expressed in territorial terms decreases." *Seach v. Richards, Dieterle & Co.*, 439 N.E.2d 208, 213 (Ind. Ct. App. 1982). Accordingly, a covenant not to compete containing a limitation as to a group of customers instead of a geographic limit can serve the same limiting function to maintain a covenant within reasonable bounds.

[13] Here, the covenant proscribes solicitation of orders from a group of persons — the "users" of Watcon's products. The evidence at the November injunction hearing showed the intent of the parties to the Agreement that the term "users" refers to a specific group of customers. Specifically, the term "users" refers to Janowiak's fifty-three active accounts that he was servicing at the time he left the company. During his cross-examination by Janowiak's counsel, Resnik testified as follows:

> Counsel: If I ask you to identify the users of Watcon's products and services as used in that sentence, would your answer be to give me a list of names of customers:
>
> Resnik: Yes.
>
> **************
>
> Counsel: One of the things that you testified about on cross-examination was the customers in his territory, and I take it that the purpose of this case is to try and preserve those relationships, right, for Watcon?

Resnik:  Yes.

Counsel:  You don't want Mr. Janowiak to go out and take over those relationships or interfere with them to the extent they already exist between Watcon and a customer in his territory, right?

Resnik:  Yes.

Appellee's App. pp. 51, 53.  In addition, Sean McMullen, Watcon's sales manager, testified about Janowiak's list of customers:

Counsel:  And you talked about customers that Mr. Janowiak serviced.  How many customers did Mr. Janowiak service for Watcon at the time he left?

McMullen:  At the time he left we [sic] he had 53 active accounts that he serviced.

*Id.* at 65-66.  This evidence was uncontested by Janowiak, and, from our review of the transcript of that injunction hearing, it appears that all the parties were familiar with the identity of the fifty-three customers and understood them to be "users."

[14]  At the March injunction hearing, Momar did not challenge this evidence. Instead, Momar offered, and the trial court admitted, Exhibit M-C, which is a list of the fifty-three Watcon customers being serviced by Janowiak at the time he left his employment with Watcon.

[15]  Thus, based upon all the evidence, we find the term "users" to be sufficiently definite such that the covenant is not unreasonable and is enforceable.  *See Norlund v. Faust*, 675 N.E.2d 1142 (Ind. Ct. App. 1997) (finding covenant sufficient and enforceable where phrase "Referring Optometrist" used in

covenant was further defined by list of optometrists in exhibit); *see also Cohoon v. Fin. Plans & Strategies, Inc.*, 760 N.E.2d 190 (Ind. Ct. App. 2001) (finding covenant enforceable even in face of allegedly overbroad geographical restriction where covenant defined class of persons with whom ex-employee was to have no contact).

[16]     Momar also asserts that paragraph 9 is overbroad as to the type of activity prohibited because it forbids Janowiak from selling any products to customers of Watcon, including those products not in competition with a product of Watcon. As we did in the companion case, we direct the parties' attention to paragraph 2 of the Agreement, which is referenced in paragraph 9 and which provides:

> 2. The Seller will attempt to find purchasers in such territory for such water treatment, water softening and other mechanical devices for the treatment of water and other products of the Company and to promote the business of the Company in conformity herewith and not to sell in such territory competitive products or to promote businesses in competition with the products and business of the Company. *Nothing herein contained, however, shall be construed to prevent the Seller from selling and promoting products and business not competitive with those of the Company.*

Appellant's App. p. 76 (emphasis added).

[17]     Contracts are to be read as a whole. *State Farm Fire and Cas. Co. v. Riddell Nat'l Bank*, 984 N.E.2d 655 (Ind. Ct. App. 2013), *trans. denied*. "The meaning of a contract is to be determined from an examination of *all* of its provisions, not from a consideration of individual words, phrases, or even paragraphs read

alone." *Washel v. Bryant*, 770 N.E.2d 902, 906 (Ind. Ct. App. 2002). Further, courts should construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless, and courts should attempt to harmonize the provisions of a contract rather than interpret the provisions as conflicting. *State Farm Fire and Cas. Co.*, 984 N.E.2d 655.

[18] In light of these rules of harmony, a reading of paragraphs 9 and 2 clearly reveals that the Agreement limits Janowiak, upon his departure from Watcon, from soliciting orders from the Watcon customers he serviced for only products and business that are in direct competition with those of Watcon. This is a reasonable limitation on the type of activity in which Janowiak, and thus Momar, may engage. The provision is reasonable and enforceable.

## B. Adequacy of Remedies at Law

[19] Momar next alleges that Watcon's remedies at law are adequate such that a preliminary injunction should not have issued. Momar's argument concerns the trial court's Findings of Fact 31, 32, 33, 34, and 35, which provide as follows:

> 31. On November 18 and 19, 2015, just two and three days after the hearing on Watcon's Motion for preliminary injunction, Janowiak, along with Momar employees Peter Farrar ("Farrar") and George Grabow ("Grabow"), visited approximately 22 of the 53 Current Customers.
>
> 32. Janowiak used "confidential information" to solicit business from 22 of the 53 Current Customers on behalf of Momar, and Momar continues to reap the benefit of the use of that

confidential information by accepting business from those customers.

33. The solicitation of Watcon's customers by Janowiak, Grabow and Farrar, on behalf of Momar, was for purposes that include generating sales from some of the 53 Current Customers in violation of Janowiak's contract with Watcon.

34. Momar continues to reap the financial benefits of Janowiak, Grabow and Farrar working in concert, for the benefit of Momar, to violate Janowiak's contract with Watcon.

35. Watcon would be irreparably harmed if Momar continues to take advantage of Grabow and Farrar acting in concert with Janowiak. Watcon would also be irreparably harmed if Momar continues to benefit from customer relationships developed using confidential information that Janowiak has been enjoined from using. Watcon's legal remedies are inadequate to protect Watcon from Momar's future actions.

Appellant's App. pp. 105-06.

[20] Injunctive relief is not available where a breach of contract can be adequately satisfied by money damages. *Cent. Ind. Podiatry, P.C. v. Krueger*, 882 N.E.2d 723 (Ind. 2008). Yet, a legal remedy is adequate only when it is as practical and efficient to the ends of justice and its prompt administration as the remedy in equity. *Id.*

[21] At the first injunction hearing on November 16, 2015, both Resnik and McMullen testified that Janowiak was "the face" of Watcon, meaning that he was the customers' primary contact with the company and that he knew the customers' preferences, ordering history, equipment, and operations. Appellee's App. pp. 11, 66. Resnik further testified that Janowiak would prepare service reports for his customer visits which contained the customer

contact, the products being used, a summary of test results, evaluation of the system, and recommendations to maintain and/or improve the customer's system. Watcon considered the information in these reports, as well as the types of products ordered and the ordering preferences, to be confidential. *Id.* at 15-16. Janowiak agreed that he developed this information for Watcon and considered it to be valuable to Watcon. *Id.* at 89. Resnik explained that keeping this information confidential is important to the company because obtaining a new customer is a long process that can take a year or more. *Id.* at 16-19.

[22] Janowiak admitted that within two weeks of leaving Watcon, he was filling orders for Momar products for at least two companies he serviced as a representative of Watcon. He further acknowledged that he would not stop soliciting orders for Momar products from Watcon customers unless court-ordered to do so. *Id.* at 97.

[23] As Janowiak testified at the November hearing, he began soliciting Watcon customers as soon as his employment with Momar commenced, and some of those fifty-three customers left Watcon and transferred their business to Momar. The evidence at the March injunction hearing disclosed that just two days after the November 16 hearing but before the injunction issued on November 24, Janowiak, George Grabow, corporate vice president at Momar and general manager of its Aquatrol Division, and Peter Farrar, a sales representative for Momar, visited these customers. Farrar testified that on November 18 and 19, 2015, following the injunction hearing on November 16,

he, Grabow, and Janowiak met with at least eight of Janowiak's fifty-three Watcon customers who were now Momar customers being serviced by Janowiak. Tr. pp. 53-54. On these visits, Janowiak introduced Farrar to the customers. On November 24, 2015, the day the preliminary injunction issued, Farrar received a call from Grabow instructing him that he would be servicing those accounts due to a legal issue with Janowiak. *Id.* at 56-57. Farrar also testified that since November 24, 2015, he has continued, on behalf of Momar, to call upon more of the fifty-three Watcon customers serviced by Janowiak during his employment with Watcon. *Id.* at 60. Farrar testified that thirteen of the fifty-three are current customers of Momar, that Momar had placed no restrictions on to whom he could sell, and that he would continue to try to sell to the remainder of the fifty-three Watcon customers unless he was restricted from doing so. *Id.* at 64. Most of the thirteen Watcon customers now serviced by Momar represented Janowiak's highest revenue sources when he was employed with Watcon. *Id.* at 35-36; Exs. M-C, 2, 3.

[24] The evidence supports the trial court's findings and clearly establishes that Watcon not only suffered economic losses but also losses to the company's goodwill. An employer is entitled to contract to protect the goodwill of its business. *Cohoon*, 760 N.E.2d 190. Elements of this goodwill include confidential information such as the names and addresses and requirements of customers and the advantage acquired through representative contact. *Id.* The evidence here shows that Watcon's goodwill was infringed upon when Janowiak, armed with the advantageous familiarity he had acquired through

his personal contact with Watcon customers and his intimate knowledge of the customers' water treatment systems and ordering habits, set about contacting those customers on Momar's behalf as soon as he began his employment with Momar in violation of his non-compete agreement with Watcon. In addition, following the November injunction hearing but prior to entry of the injunction, Janowiak visited these customers with Grabow and Farrar in order to introduce Farrar to the customers so that Momar could maintain them as customers should an injunction issue against Janowiak.

[25] We therefore conclude, as did a panel of this Court in *Norlund*, 675 N.E.2d at 1149-50, that "[w]hen a covenant not to compete of this nature is breached, it follows that the employer will suffer harm. It would be pure speculation to place a dollar amount on the damages, and an injunction against the prohibited behavior is the most efficient way to lift the burden of that harm from the shoulders of the employer who contracted so as not to suffer such harm." The trial court properly concluded that the remedies at law available to Watcon would be insufficient. *See Robert's Hair Designers, Inc. v. Pearson*, 780 N.E.2d 858 (Ind. Ct. App. 2002) (finding that beauticians' violation of non-compete agreement harmed salon's client relationships and supported finding of irreparable harm); *Unger v. FFW Corp.*, 771 N.E.2d 1240 (Ind. Ct. App. 2002) (finding inadequate remedy at law where employee's breach of non-compete agreement resulted in loss of goodwill, client confidence, and business reputation).

# C. Threatened Injury and Potential Harm

[26] A court may dispense injunctive relief only when the threatened injury to the moving party outweighs the potential harm to the nonmoving party from the granting of an injunction. *Cent. Ind. Podiatry, P.C.*, 882 N.E.2d 723. The trial court's findings on this topic include:

> 34. Momar continues to reap the financial benefits of Janowiak, Grabow and Farrar working in concert, for the benefit of Momar, to violate Janowiak's contract with Watcon.
>
> 35. Watcon would be irreparably harmed if Momar continues to take advantage of Grabow and Farrar acting in concert with Janowiak. Watcon would also be irreparably harmed if Momar continues to benefit from customer relationships developed using confidential information that Janowiak has been enjoined from using. Watcon's legal remedies are inadequate to protect Watcon from Momar's future actions.

Appellant's App. p. 106.

[27] Momar argues that it will be harmed by injunctive relief through lost profits and potential liability to customers. Yet, Momar's situation is of its own making. The customers Momar is referring to are the very same customers that Janowiak and Momar appropriated from Watcon in violation of Janowiak's non-compete agreement. Momar also mentions a potential claim for damages should it be wrongfully enjoined; however, we note that when the trial court extended the injunction to include Momar, it also extended to Momar the protection of the surety bond posted by Watcon.

On the other hand, if Watcon is not granted injunctive relief, it will suffer lost profits, lost customer goodwill, and lost benefit of its covenant not to compete. The evidence shows that Watcon has already suffered these losses due to the appropriation of its customers by Janowiak, on behalf of Momar, in violation of his covenant not to compete with Watcon. Watcon stands to lose further profits and goodwill from any additional Watcon customers Momar could obtain by continuing to solicit the remaining Watcon customers previously serviced by Janowiak when he was employed by Watcon. In fact, Farrar testified that he has continued to solicit Janowiak's Watcon customers on Momar's behalf and, unless ordered to stop, he would continue to do so. The trial court properly concluded the threatened injury to Watcon outweighs the potential harm to Momar if an injunction issued.

# D. Public Interest

Momar claims that the granting of the injunction disserves the public interest because it negatively impacted Momar's service to its customers. Whether a particular covenant is against public policy is a question of law for the court to determine from all the circumstances. *Robert's Hair Designers, Inc.*, 780 N.E.2d 858. In making this determination, we are mindful that there exists a very strong presumption of enforceability of contracts that represent the freely bargained agreement of the parties. *Id.* This presumption reflects the principle that it is in the best interest of the public not to unnecessarily restrict peoples' freedom to contract. *Id.* Particularly, we recognize an employer's right to contract to protect the goodwill of its business. *Cohoon*, 760 N.E.2d 190.

[30] First, Momar maintains that the granting of the injunction disserves the public interest because it rendered Momar unable to service eight of its customers. Momar's inability to service its customers is not a public interest but rather a private interest of Momar's. Moreover, these eight customers are Watcon customers appropriated by Janowiak in violation of his non-compete agreement with Watcon.

[31] Here we must pause to address a key misconception underlying the arguments in Momar's brief to this Court. Momar argues that each of these eight customers was "secured by Momar (through Janowiak) before the November Injunction issued." Appellant's Br. p. 33. It appears from this statement that Momar believes that prior to the issuance of the November injunction, it was permissible for Janowiak to solicit his Watcon customers on behalf of Momar. This is not the case. Janowiak was prohibited from doing so by his non-compete agreement with Watcon. Momar completely dismisses the fact that Watcon had to obtain the November injunction to stop Janowiak from violating the non-compete agreement by soliciting Watcon customers. Therefore, the Watcon customers obtained by Janowiak and Momar prior to the issuance of the November injunction were obtained in violation of Janowiak's non-compete agreement with Watcon.

[32] Furthermore, Momar created the situation of which it now complains by assisting Janowiak in breaching his non-compete agreement with Watcon. Once the November injunction issued, Momar transferred these accounts to Farrar for sales and servicing. It is a fundamental principle in Indiana that the

law will not permit persons to do indirectly, or through others, what he or she could not do directly him or herself. *Norlund*, 675 N.E.2d 1142. Here, Momar acted in concert with Janowiak to indirectly, or through Farrar, continue to solicit and service Janowiak's Watcon customers because Janowiak is precluded from doing so himself by the non-compete agreement he entered into with Watcon.

[33] In addition, Momar alleges that the granting of the injunction disserved the public interest because of Watcon's chemical handling and labeling. At the March injunction hearing, Grabow testified to finding at one Watcon customer facility some jugs that were not labeled and a chemical label that, according to him, did not contain all of the information required by the Environmental Protection Agency (EPA). On cross-examination Grabow admitted that he had neither contacted Watcon about this, nor filed anything with the EPA.

[34] In light of all the evidence, an injunction in this case is not contrary to the public interest but rather furthers the public interest by recognizing an employer's freedom to contract to protect the goodwill of its business and by not rewarding the type of behavior in which Momar engaged when it acted in concert with Janowiak to violate his non-compete agreement with Watcon. The trial court properly concluded that the public interest would not be disserved by the grant of a preliminary injunction against Momar.

## 2. Modification of Terms

[35] Momar challenges the language of the preliminary injunction order, arguing that the trial court impermissibly modified the terms of paragraph 9 of the Agreement. Trial courts have full discretion to fashion equitable remedies that are complete and fair to all parties involved. *Robert Neises Constr. Corp. v. Grand Innovations, Inc.*, 938 N.E.2d 1231 (Ind. Ct. App. 2010).

[36] Paragraph 9 of the Agreement provides:

> 9. The obligations imposed upon the Seller by Paragraph 2, and clause (A) of Paragraph 3 above, shall continue in effect regardless of the means or circumstances by which either this agreement or the active solicitation of orders in such territory may be terminated. For a period of two (2) years after the termination of this agreement, by mutual consent or otherwise, the Seller promises that he will not, directly or indirectly, *solicit orders* from the *users of the Companys' [sic] products in said territory*, provided that, if the applicable law of such territory fixes a shorter period of restraint, such shorter applicable statutory limitation shall be deemed to fix the maximum limit of such restraint.

Appellant's App. p. 78 (emphasis added). Paragraph 1 of the trial court's order enjoining Momar in this action provides:

> 1. Defendant, Momar, Inc., is preliminarily enjoined through September 3, 2017, from taking any action whatsoever in concert or participation with Janowiak to *generate or accept orders* from *any of the 53 Current Customers* for *products and/or services that compete with products and/or services provided by Watcon*. The "53 Current Customers" is defined in Paragraph 20 of the Preliminary Findings of Fact contained in the Preliminary Injunction Order, and are listed on Exhibit "M-C" admitted into evidence at the Hearing on March 17, 2016. In addition, Momar, Inc., is preliminarily enjoined through September 3, 2017, from *accepting*

> *or filling orders* from *any of the 53 Current Customers* for *products and/or services that compete with the products and/or services provided by Watcon* if Janowiak has at any time and in any way acted in concert or participation with Momar in soliciting business from that customer.

*Id.* at 108 (emphasis added).

[37]    First, Momar questions the court's use in its order of the terms "generate or accept" and "accepting or filling" because paragraph 9 of the Agreement uses the term "solicit." Paragraph 9 of the Agreement states that Janowiak "will not, directly or indirectly, solicit." The trial court's language enjoining Momar is encompassed by the language in paragraph 9. Whether Momar directly or indirectly solicits, generates, accepts, or fills an order for products, the end result is the same: Momar is selling to and/or servicing Janowiak's Watcon customers in violation of Janowiak's non-compete agreement with Watcon.

[38]    Next, Momar asserts that the trial court improperly modified the terms of the Agreement by using "53 Current Customers" in its order instead of using the term "users" from paragraph 9 of the Agreement. As stated previously in our discussion, the evidence at the November injunction hearing showed Janowiak's and Watcon's understanding of the term "users," as employed in paragraph 9 of the Agreement. Watcon presented evidence that the term "users" refers to Janowiak's fifty-three active accounts that he was servicing at the time he left the company, and Janowiak did not contest this evidence.

[39]    Furthermore, at the March injunction hearing, Momar did not challenge this evidence either. Instead, Momar offered, and the trial court admitted, Exhibit

M-C, which is a list of the fifty-three Watcon customers being serviced by Janowiak at the time he left his employment with Watcon. Thus, all the parties demonstrated their familiarity with the fifty-three customers and their understanding that these customers are the "users" referred to in the Agreement. The trial court did not impermissibly modify the terms of the Agreement as a result of the language it used in its injunction order.

[40] Momar also alleges the trial court improperly added terms to the Agreement by enjoining Momar from accepting orders for products and services "that compete with products and/or services provided by Watcon." Paragraph 9 of the Agreement simply says that Janowiak "will not, directly or indirectly, solicit orders from the users of the Companys' [sic] products in said territory."

[41] In a prior argument, Momar claimed that this terminology in paragraph 9 is overbroad because it forbids Janowiak from selling any products to customers of Watcon, including those products not in competition with a product of Watcon. *See* Section 1., A., *supra*. As we did previously, we again direct Momar to paragraph 2 of the Agreement, which states:

> 2. The Seller will attempt to find purchasers in such territory for such water treatment, water softening and other mechanical devices for the treatment of water and other products of the Company and to promote the business of the Company in conformity herewith and not to sell in such territory competitive products or to promote businesses in competition with the products and business of the Company. *Nothing herein contained, however, shall be construed to prevent the Seller from selling and promoting products and business not competitive with those of the Company.*

Appellant's App. p. 76 (emphasis added).

[42] The meaning of a contract is to be determined from an examination of all of its provisions, not from a consideration of isolated words, phrases, or paragraphs. *Washel*, 770 N.E.2d 902. Further, courts should construe the language in a contract by attempting to harmonize the provisions. *State Farm Fire and Cas. Co.*, 984 N.E.2d 655.

[43] Reading the Agreement as a whole, paragraphs 9 and 2 make it clear that the Agreement limits the sale of competing products and/or services to Janowiak's Watcon customers. Thus, the court did not improperly add terms to the Agreement as a result of the language it used in its order; rather, it properly stated the intent of the parties as evidenced by their Agreement.

[44] In light of the foregoing, we affirm the judgment of the trial court.

[45] Judgment affirmed.

Kirsch, J., and Altice, J., concur.