ATTORNEYS FOR APPELLANT
James A. Knauer
Steven E. Runyan
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
Joseph J. Reiswerg
Carmel, Indiana



## In the
## Indiana Supreme Court

No. 29S05-0706-CV-256

CENTRAL INDIANA PODIATRY, P.C.,

*Appellant (Plaintiff below),*

v.

KENNETH KRUEGER,
MERIDIAN HEALTH GROUP, P.C.,

*Appellee (Defendant below).*

Appeal from the Hamilton County Superior Court, No. 29D02-0510-PL-93549
The Honorable Daniel J. Pfleging, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 29A05-0606-CV-313

**March 11, 2008**

**Boehm, Justice.**

We hold that noncompetition agreements between a physician and a medical practice group are not per se void as against public policy and are enforceable to the extent they are reasonable. To be geographically reasonable, the agreement may restrict only that area in which the physician developed patient relationships using the practice group's resources.

**Facts and Procedural History**

From 1996 until 2005, podiatrist Kenneth Krueger was employed by Central Indiana Podiatry, P.C. (CIP) under a series of written employment agreements that were renewed every one or two years. Each agreement contained provisions restricting Krueger's activities after any termination. For two years after leaving CIP's employ, Krueger would be prohibited from divulging the names of patients, contacting patients to provide podiatric services, and soliciting CIP employees. Krueger also would be prohibited from practicing podiatry for two years within a geographic area defined as fourteen listed central Indiana counties and "any other county where [CIP] maintained an office during the term of this Contract or in any county adjacent to any of the foregoing counties." CIP maintained an office in two unlisted counties, and another twenty-seven counties are contiguous to one or more of these sixteen. The restricted area thus consisted of forty-three counties, essentially the middle half of the state.

At some point, Krueger worked at CIP's offices in Clinton, Marion, Howard, Tippecanoe, and Hamilton counties. By 2005, he was working three days each week at the Nora office in Indianapolis (Marion County), and one day each at the Lafayette (Tippecanoe) and Kokomo (Howard) offices. In 2005, a Kokomo office employee reported to CIP that Krueger had attempted to kiss her at the office. While CIP was investigating the incident, Krueger, concerned that he might be terminated, obtained an electronic copy of the names and addresses of patients treated at the Nora office.[1] CIP terminated Krueger on July 25, 2005.

In September 2005, Krueger entered into an employment agreement to practice podiatry with Meridian Health Group, P.C. in Hamilton County. Hamilton is immediately north of Marion County and is one of the counties listed in Krueger's noncompetition agreement. Krueger provided a copy of the CIP patient list to Meridian, and along with other Meridian employees, created a letter announcing his employment with Meridian "approximately 10 minutes from [Krueger's] previous office" in northern Marion County. This letter was mailed to patients on September 30, 2005.

---

[1] This list contained the names of current and former Nora office patients. The record is unclear whether Krueger himself treated all the listed patients. CIP's complaint states that Krueger was the "sole podiatrist" at the Nora office and that the list was of patients "treated by Krueger," but there is no evidence on that point. The list in its present form in the record also contains names of nonpatients added by Krueger.

When it learned of the letter CIP sought injunctive relief against Krueger and damages from Krueger and Meridian, claiming that Krueger's employment violated the geographic limitations.[2] The trial court entered a temporary restraining order which was lifted six days later pending a hearing on the request. After a full-day hearing in January 2006, the trial court found the geographic restriction unenforceable and denied CIP's request for a preliminary injunction. The Court of Appeals reversed. Cent. Ind. Podiatry, P.C. v. Krueger, 859 N.E.2d 686, 689 (Ind. Ct. App. 2007), reh'g denied. We granted transfer. ___ N.E.2d ___ (Ind. June. 27, 2007).

The noncompetition agreement's two-year term expired on July 25, 2007, two years after Krueger's termination. CIP's request for injunctive relief is therefore moot. In general, we decline to address the merits of moot claims unless the matter is of public interest and capable of repetition. Horseman v. Keller, 841 N.E.2d 164, 170 (Ind. 2006) (citing Ind. Educ. Employment Relations Bd. v. Mill Creek Classroom Teachers Ass'n, 456 N.E.2d 709, 712 (Ind. 1983)). This case meets this standard. Injunctive actions based on physician noncompetition agreements raise significant policy concerns and recur frequently. See Sharvelle v. Magnante, 836 N.E.2d 432 (Ind. Ct. App. 2005) (ophthalmologist); Duneland Emergency Physician's Med. Group, P.C. v. Brunk, 723 N.E.2d 963 (Ind. Ct. App. 2000) (emergency room physician); Norlund v. Faust, 675 N.E.2d 1142 (Ind. Ct. App. 1997) (optometrist). Moreover, full appellate review will often require more time than the term of the noncompetition agreement, so the need for guidance to trial courts in the future dictates that we address CIP's claim for injunctive relief.

### Standard of Review

To obtain a preliminary injunction, the moving party must demonstrate by a preponderance of the evidence: (1) a reasonable likelihood of success at trial; (2) the remedies at law are inadequate; (3) the threatened injury to the movant outweighs the potential harm to the nonmoving party from the granting of an injunction; and (4) the public interest would not be disserved by granting the requested injunction. Apple Glen Crossing, LLC v. Trademark Retail, Inc., 784

---

[2] CIP also sought injunctive relief against Krueger for solicitation of CIP patients and a CIP employee. The trial court did not rule on these claims, which are now moot as to injunctive relief. In addition to injunctive relief, CIP sought damages from Krueger for breach of the covenant of noncompetition during employment and from Meridian for tortious interference with contractual relations. These claims remain for resolution in the trial court.

N.E.2d 484, 487 (Ind. 2003) (citing <u>Ind. Family & Soc. Servs. Admin. v. Walgreen Co.</u>, 769 N.E.2d 158, 161 (Ind. 2002)). We review a trial court's grant or denial of a preliminary injunction for abuse of discretion. <u>Id.</u> at 488.

## I. Enforceability of the Noncompetition Agreement

Krueger raises four issues that bear on the likelihood of CIP's success at trial: (1) whether the noncompetition agreement is void as against public policy; (2) whether the noncompetition agreement is reasonable; (3) whether his actions were justified by the Indiana Administrative Code; and (4) whether the employment contract is unenforceable because of a prior material breach.

### A. *Public Policy*

Krueger argues that the noncompetition agreement is void as against public policy because noncompetition agreements involving physicians interfere with the physician-patient relationship. There is some force to this contention. Noncompetition agreements are justified because they protect the investment and good will of the employer. In many businesses, the enforceability of a noncompetition agreement affects only the interests of the employee and employer. A noncompetition agreement by a physician involves other considerations as well. Unlike customers of many businesses, patients typically come to the physician's office and have direct contact with the physician. If an agreement forces a physician to relocate outside the geographic area of the physician's practice, the patients' legitimate interest in selecting the physician of their choice is impaired. Moreover, the confidence of a patient in the physician is typically an important factor in the relationship that relocation would displace. In both respects physicians are unlike employees in many businesses. The legal framework applicable to these relationships needs to take these differences into account.

Whether physicians should be prohibited from entering into noncompetition agreements is essentially a policy question. Three states have statutes prohibiting physician noncompetition agreements.[3] In the absence of any Indiana legislation on this point, Krueger points to an Ameri-

---

[3] Colo. Rev. Stat. Ann. § 8-2-113(3) (West 2007); Del. Code Ann. tit. 6, § 2707 (2005); Mass. Gen. Laws Ann. ch. 112, § 12X (West 2003).

4

can Medical Association ethics opinion discouraging but not prohibiting noncompetition agreements.[4]  Krueger also cites a recent Tennessee Supreme Court case, Murfreesboro Medical Clinic, P.A. v. Udom, which relied largely on the AMA opinion in holding that essentially all physician noncompetition agreements violate public policy.  166 S.W.3d 674, 684 (Tenn. 2005).  For the reasons expressed below, we disagree, and note that the Tennessee legislature has since acted to permit physician noncompetition agreements.  See Act of June 21, 2007, 2007 Tenn. Pub. Acts 487 (to be codified at Tenn. Code Ann. § 63-1-148, effective Jan. 1, 2008) (permitting physician noncompetition agreements if they are in writing, last two years or less, and keep within certain geographical limitations).

The AMA's views of noncompetition agreements between physicians were in place when we upheld such agreements in Raymundo v. Hammond Clinic Ass'n, 449 N.E.2d 276 (Ind. 1983).  At that time, we rejected the claim that "public policy precludes medical doctors from entering into or enforcing non-competition covenants," and we adopted a reasonableness standard for physician noncompetition agreements.  Id. at 280–81.  Raymundo is consistent with the substantial majority of United States jurisdictions in permitting reasonable restrictions.  See Ferdinand S. Tinio, Annotation, Validity and Construction of Contractual Restrictions on Right of Medical Practitioner to Practice, Incident to Employment Agreement, 62 A.L.R.3d 1014 §§ 6–25 (1975).

The Supreme Court of Illinois also recently considered the enforceability of noncompetition agreements between physicians and was presented with the same authorities cited by Krueger.  The court concluded that the issue is essentially a balancing of policy considerations

---

[4] The AMA's opinion on "Restrictive Covenants and the Practice of Medicine" provides:

> Covenants-not-to-compete restrict competition, disrupt continuity of care, and potentially deprive the public of medical services.  The Council on Ethical and Judicial Affairs discourages any agreement which restricts the right of a physician to practice medicine for a specified period of time or in a specified area upon termination of an employment, partnership, or corporate agreement.  Restrictive covenants are unethical if they are excessive in geographic scope or duration in the circumstances presented, or if they fail to make reasonable accommodation of patients' choice of physician.

Am. Med. Ass'n Council on Ethical & Judicial Affairs, Op. E-9.02 (1998), available at http://www.ama-assn.org/ama/pub/category/8519.html.

best left to the legislature. Mohanty v. St. John Heart Clinic, S.C., 866 N.E.2d 85, 95 (Ill. 2006) ("[C]ountervailing reasons exist which would militate against any deviation from our long-standing practice of finding reasonable restrictive covenants in medical employment contracts enforceable. . . . For this reason, we believe that prohibiting restrictive covenants in medical practice contracts is a decision better left to the legislature, where the competing interests can be fully aired."). We agree with the Supreme Court of Illinois. Raymundo has been on the books for over twenty years, and our legislature has not seen fit to address the subject. Any decision to ban physician noncompetition agreements altogether should be left to the legislature.

B. *Reasonableness*

This Court has long held that noncompetition covenants in employment contracts are in restraint of trade and disfavored by the law. Dicen v. New Sesco, Inc., 839 N.E.2d 684, 687 (Ind. 2005); Harvest Ins. Agency, Inc. v. Inter-Ocean Ins. Co., 492 N.E.2d 686, 688 (Ind. 1986); Licocci v. Cardinal Assocs., Inc., 445 N.E.2d 556, 561 (Ind. 1983); Donahue v. Permacel Tape Corp., 234 Ind. 398, 404, 127 N.E.2d 235, 237 (1955); see also Restatement (Second) of Contracts, § 188 cmt. g (1981) ("Post-employment restraints are scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through loss of his livelihood."). We construe these covenants strictly against the employer and will not enforce an unreasonable restriction. Harvest Ins., 492 N.E.2d at 688; Licocci, 445 N.E.2d at 561. For the reasons noted above, agreements by physicians should be given particularly careful scrutiny.

To be enforceable, a noncompetition agreement must be reasonable. Unlike reasonableness in many other contexts, the reasonableness of a noncompetition agreement is a question of law. Raymundo, 449 N.E.2d at 280 (citations omitted). In arguing the reasonableness of a non-competition agreement, the employer must first show that it has a legitimate interest to be protected by the agreement. Sharvelle v. Magnante, 836 N.E.2d 432, 436–37 (Ind. Ct. App. 2005) (citing Pathfinder Commc'ns Corp. v. Macy, 795 N.E.2d 1103, 1109 (Ind. Ct. App. 2003)); see id. The employer also bears the burden of establishing that the agreement is reasonable in scope as to the time, activity, and geographic area restricted. Sharvelle, 836 N.E.2d at 436 (citing Path-

6

finder, 795 N.E.2d at 1109); see Dicen, 839 N.E.2d at 688–89 (Ind. 2005); Raymundo, 449 N.E.2d at 280.

Indiana courts have held that "the advantageous familiarity and personal contact which employees derive from dealing with an employer's customers are elements of an employer's 'good will' and are a protectible interest which may justify a restraint . . . ." E.g., Licocci, 445 N.E.2d at 561–62 (Ind. 1983) (citations omitted). CIP asserts that the noncompetition agreement serves its legitimate interest of protecting its good will and investment in developing its patient base. The trial court disagreed as to good will, finding "no evidence that the protection sought by CIP relates to its good will." The trial court found CIP's goal was to "protect its patient population and insure that there was no loss of income." We accept these findings, but do not agree that they establish that CIP has no legitimate interest in restricting its employees. Rather, we agree with the Court of Appeals that CIP demonstrated that the agreement served the legitimate interest of preserving patient relationships developed with CIP resources and to that extent served a legitimate interest of CIP. See Cent. Ind. Podiatry, 859 N.E.2d at 693 (citing Unger v. FFW Corp., 771 N.E.2d 1240, 1244 (Ind. Ct. App. 2002)).[5]

Although CIP has asserted a legitimate interest served by the noncompetition agreement, to be enforceable, the noncompetition agreement must also be reasonable in terms of the time, activities, and geographic area restricted. The parties accept two years as a reasonable period of time and dispute only the reasonableness of the geographic restriction. The trial court found the noncompetition agreement "invalid, unenforceable and geographically unreasonable." The Court of Appeals agreed that the geographic restriction "covers a significant portion of Indiana," but upheld the geographic restriction, finding that it was reasonable in light of CIP's several locations and evidence that CIP offices drew patients from surrounding counties. Cent. Ind. Podiatry, 859 N.E.2d at 694. For the reasons explained below, we agree with the trial court that the geographic restriction is unreasonable under the facts of this case.

Whether a geographic scope is reasonable depends on the interest of the employer that the restriction serves. Cf. Slisz v. Munzenreider Corp., 411 N.E.2d 700, 707–09 (Ind. Ct. App.

[5] To the extent CIP claims use of trade secrets or confidential information, those interests are adequately protected by the availability of tort recovery. Those claims are not presented in this interlocutory appeal addressing only the enforcement of contractual provisions.

1980) (know-how or "unique skills" derived from the employer may justify a wider scope). Here the only basis justifying restriction is CIP's investment in developing its patient base. Raymundo held that the geographic reasonableness of a noncompetition agreement depends on the area served by the physician group, the area served by the physician, and the area restricted by the agreement. 449 N.E.2d at 281. The noncompetition agreement in Raymundo restricted an orthopedic surgeon's practice within a twenty-five mile radius of where he had practiced. Although an incomplete record prevented us from ruling on the geographic reasonableness of that agreement, we commented on our approach to such a ruling. We noted that there was evidence that Raymundo's patient base came from the same geographic area as the Hammond Clinic's and that we were "concerned with the area from which the Clinic drew its patients." Id. at 282. That statement was made in the context of a single location where the area of practice of the physician and his employer were the same. Here, however, CIP has a number of offices, including one in Hamilton County, where the record does not establish that Krueger practiced within two years of his termination. An employer has invested in creating its physician's patient relationships only where the physician has practiced. We agree with the courts that have held that noncompetition agreements justified by the employer's development of patient relationships must be limited to the area in which the physician has had patient contact. See Tinio, supra §§ 18–20.

The record does not support any inference that Krueger used CIP's resources to establish relationships throughout the approximately forty counties the agreement identifies by name or description. Because that is the area sought to be restricted by the agreement, the agreement is clearly overbroad. If a noncompetition agreement is overbroad and it is feasible to strike the unreasonable portions and leave only reasonable portions, the court may apply the blue pencil doctrine to permit enforcement of the reasonable portions. Dicen, 839 N.E.2d at 687; Licocci, 445 N.E.2d at 561. The blue pencil doctrine permits excising language but not rewriting the agreement. See Licocci, 445 N.E.2d at 561. CIP chose to define its geographic scope in terms of counties rather than the radius from the workplace used in Raymundo or some smaller area.[6]

---

[6] The geographic restriction provides in full:

During the term of this Contract and for a period of two (2) years after the termination or non-renewal of this Contract, Employee shall not engage, directly or indirectly, in the practice of podiatry or podiatric surgery within the counties of Marion, Boone, Hamilton, Hancock, Shelby, Johnson, Morgan, Hendricks, Howard, Tippecanoe, Grant, Tipton, Vigo and Madison, or in any other county where Corporation maintained an office during

CIP also chose two years after termination as a reasonable time period for its noncompetition agreement. When this period begins to run as to any single location varies with when Krueger left that location. CIP bore the burden of establishing its claim and established that Krueger practiced in only three counties—Marion, Tippecanoe, and Howard—within two years of his termination. Because Marion, Tippecanoe, and Howard are named counties in which the record established that Krueger worked in the two years preceding his termination, the geographic scope is sustainable as to them.

However, the geographic scope is unreasonable to the extent it reaches contiguous counties. The Nora office in northern Marion County is nearly forty miles from parts of contiguous Johnson County. As one would expect, and as the dissent observes, the record established that some patients cross county lines for podiatry services. But there is nothing to suggest the improbable flow of a substantial number of podiatry patients from Johnson County across a heavily trafficked metropolitan area to Nora. Similarly, because CIP selected entire counties as the building blocks of its agreement, even more proximate Hamilton County includes an area too broad to be reasonable. We assume the dissent is correct that southern Hamilton County and northern Marion County, including the Nora area, form a common economic bond, but there is nothing to suggest that CIP's Nora office has a significant contingent of patients traveling from Arcadia, Atlanta, or other communities in northern Hamilton County. Accordingly, the contiguous county restriction is unreasonable, and the restriction applies only to Marion, Tippecanoe, and Howard counties.

C. *Indiana Administrative Code*

Krueger argues, and the trial court held, that the Indiana Administrative Code "obligat[ed]" Krueger "to provide written notice to his former patients that he had changed practice groups" and that "CIP implicitly authorized Krueger to utilize its patient list to accomplish this task." The Indiana Board of Podiatric Medicine's Standards of Professional Conduct provide that a podiatrist shall "[g]ive reasonable written notice to a patient or to those responsible for the patient's care when the podiatrist withdraws from a case so that another practitioner may be em-

the term of this Contract or in any county adjacent to any of the foregoing counties, either as an employee, agent, partner, proprietor or independent contractor, without the prior consent of Corporation.

ployed by the patient or by those responsible for the patient's care." 845 Ind. Admin. Code 1-6-1 (2004). The regulations also provide that

> A podiatrist, upon his retirement, or upon discontinuation of the practice of podiatric medicine or surgery, or upon leaving or moving from a community, shall notify all of his active patients in writing, or by publication once a week for three (3) consecutive weeks in a newspaper of general circulation in the community, that he intends to discontinue his practice of podiatric medicine and surgery in the community, and shall encourage his patients to seek the services of another practitioner . . . .

Id. 1-6-6(b).

These provisions do not either justify or call into question the validity of a restriction on the area in which a podiatrist may practice. They merely require notice to patients that the move will take place.

### D. *Prior Material Breach*

Finally, Krueger argues that CIP is not reasonably likely to succeed at trial because CIP materially breached the employment contract by failing to provide a $350 per month car allowance included in the contract, rendering the noncompetition agreement unenforceable. The trial court and Court of Appeals did not address this issue. Cent. Ind. Podiatry, 859 N.E.2d at 696.

Krueger is correct that a breach by the employer may prevent enforcement of a noncompetition agreement. E.g., Licocci, 492 N.E.2d at 561. See generally T.C. Williams, Annotation, Restrictive Clause in Employment or Sales Contract to Prevent Future Competition or Performance of Services for Others as Affected by Breach of Party Seeking to Enforce It, of His Own Obligations Under the Contract, 155 A.L.R. 652 (1945) (summarizing cases in which breach prevented employer from enforcing noncompetition agreement). Because of the relative amounts involved, CIP's failure to pay the car allowance is arguably immaterial in the context of an agreement providing a podiatrist's compensation, but the record is unclear as to the amount of Krueger's compensation.[7] In any event, the employment contract contained a "no-defense" provision that the noncompetition agreement

---

[7] At the hearing, Krueger testified that he "believe[d] [he] made in the low 50's" from CIP the previous year. The employment contract provided that Krueger's compensation would be forty percent of the collections generated from Krueger's accounts receivable and guaranteed compensation of at least $3,333.33

10

> shall be construed as independent of any other provision of this Contract and shall survive the termination of this Contract. The existence of any claim or cause of action of Employee against Corporation, whether predicated on this Contract or otherwise, shall not constitute a defense to the enforcement by Corporation of this Restrictive Covenant.

To the extent we find any authority on no-defense provisions, the provisions have been upheld, even in the face of apparently major breaches by the employer. Orkin Exterminating Co. v. Gill, 152 S.E.2d 411, 413 (Ga. 1966) (alleged wrongful termination); French v. Cmty. Broad. of Coastal Bend, Inc., 766 S.W.2d 330, 334 (Tex. Ct. App. 1989) (alleged failure to give severance pay, failure to give notice of termination, failure to buy home as agreed, refusal to issue stock). There may be some breaches by the employer that would override such a contractual provision, but at least the relatively minor issues Krueger raises are not sufficient to deprive CIP altogether of the right to enforce the noncompetition agreement.

## II. Adequacy of Remedies at Law

Injunctive relief is not available where the breach can be adequately satisfied by money damages. Ind. Family & Soc. Servs. Admin. v. Walgreen, 769 N.E.2d 158, 162–63 n.4 (Ind. 2002). However, a legal remedy is adequate only when it is "as plain and complete and adequate—or, in other words, as practical and efficient to the ends of justice and its prompt administration—as the remedy in equity." Washel v. Bryant, 770 N.E.2d 902, 907 (Ind. Ct. App. 2002.)

Although we have not addressed this issue, the Court of Appeals has consistently held that a preliminary injunction is appropriate to remedy a breached noncompetition agreement. Robert's Hair Designers, Inc. v. Pearson, 780 N.E.2d 858, 865 (Ind. Ct. App. 2002) (finding that beauticians' violation of a noncompetition agreement harmed salon's client relationships and supported a finding of irreparable harm); Unger v. FFW Corp., 771 N.E.2d 1240, 1246 (Ind. Ct. App. 2002) (finding inadequate remedy at law when employer testified that employee's breach of noncompetition agreement resulted in lost good will, lost client confidence, and loss of busi-

---

per month, or $40,000. In its complaint, CIP states that it "collected approximately $225,000 in patient fees in the last year from Krueger's services at the Corporation's Nora office." This figure, which excludes collections from the Kokomo and Lafayette offices, would put Krueger's salary around $90,000. Krueger testified that the Nora office generated approximately 4.4 percent of CIP's annual collections, or $202,400 of $4,600,000. These figures would start Krueger's salary at $80,960. Krueger also testified that "collections were like 250- or 260-," which would start his salary at $100,000 to $104,000.

ness reputation); see Norlund v. Faust, 675 N.E.2d 1142, 1150, 1155 (Ind. Ct. App. 1997), trans. denied 690 N.E.2d 1180 (Ind. 1997) (granting injunctive relief when optometrist hired to generate good will breached noncompetition covenant); cf. Pathfinder Commc'ns Corp. v. Macy, 795 N.E.2d 1103, 1116–17 (Ind. Ct. App. 2003) (finding adequate remedy at law when radio station manager testified that advertisers were not leaving to follow previous on-air personality).

We agree that in many circumstances, including this case, injunctive relief is appropriate for a breach of a noncompetition agreement. Damages from some wrongs may be readily quantified. Cf. Walgreen, 769 N.E.2d at 162–63 n.4. The revenue from patients who move to Dr. Krueger from the CIP offices where he worked may be measured, but the effect of Dr. Krueger's move on new patients is unlikely to be provable and may be substantial. We assume that many patients choose their physicians based on referrals by other patients and word of mouth references from patients. Others use the yellow pages and other sources. As a result, it is virtually impossible to quantify the profits diverted by Krueger's move.

Finally, Krueger argues that CIP admitted it has an adequate remedy at law because it requested money damages in addition to injunctive relief. However, Trial Rule 8(E)(2) specifically allows pleading in the alternative, and alternative requests for damages and injunctive relief have not been fatal to equitable claims in the past. See, e.g., Robert's Hair Designers, 780 N.E.2d at 862 (noting that Robert's sought injunctive relief and damages).

### III. Threatened Injury and Potential Harm

A court may issue injunctive relief only when the threatened injury to the moving party (here CIP) outweighs the potential harm to the nonmoving party (Krueger) resulting from the granting of an injunction. Apple Glen Crossing, LLC v. Trademark Retail, Inc., 784 N.E.2d 484, 487 (Ind. 2003) (citing Ind. Family & Soc. Servs. Admin. v. Walgreen, 769 N.E.2d 158, 161 (Ind. 2002)). Krueger claims that injunctive relief will harm him in two ways. First, Krueger testified that he has lived in Indianapolis since 1977, and it would be "difficult" for him to leave the area to practice podiatry elsewhere. He also estimated that opening a practice from scratch elsewhere would cost approximately $75,000 plus rent and supplies. There is nothing in the record discussing the availability of employment with another clinic as a means of avoiding this investment. Because we have blue penciled his agreement the first issue is minimized. And the

12

second is not an expense, but merely an investment in a presumably profitable enterprise.  On the other hand, if CIP is not granted injunctive relief, it is denied the benefit of its agreement.  We think this balance tips in favor of enforcing the agreement by injunctive relief.

## IV.  Public Interest

The parties' arguments regarding whether a preliminary injunction would disserve the public interest are largely the same as those regarding whether physician noncompetition agreements should be void as against public policy.  CIP also argues that an injunction would not harm the public because CIP provided qualified physicians to meet the needs of all patients who would have seen Krueger.  Because physician noncompetition covenants are not per se unenforceable and because CIP looked after the needs of its patients, a preliminary injunction would not have disserved the public interest.

## Conclusion

The trial court's order denying CIP a preliminary injunction is affirmed except as to Marion, Tippecanoe, and Howard counties, and this case is remanded to the trial court for disposition of CIP's remaining claims.

Sullivan and Rucker, JJ., concur.

Shepard, C.J., dissents with separate opinion in which Dickson, J., joins.

13

**SHEPARD, Chief Justice, dissenting.**

Krueger practiced podiatry with Central Indiana in both the far northern part of Marion County and in southern Hamilton County under a contract providing that he would not compete against them in either county for two years after the business relationship ended.

Thereafter, Krueger left Central and set up shop in Hamilton County just ten minutes from his former main site of practice on 86th Street in Marion County.

The competitive reality is that these two areas function as one for commercial purposes. That a county line divides these two locations means very little to most customers or purveyors of service, and I wouldn't regard it as grounds for a court voiding a contract by which two relatively sophisticated parties ordered their commercial relationship.

Dickson, J., joins.