

FILED

Apr 04 2018, 9:26 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Blake J. Burgan
Manuel Herceg
Steven C. Shockley
TAFT STETTINIUS & HOLLISTER LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Michael H. Michmerhuizen
H. Joseph Cohen
BARRETT MCNAGNY LLP
Fort Wayne, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Great Lakes Anesthesia, P.C., | April 4, 2018 |
| *Appellant-Defendant/Counterclaimant,* | Court of Appeals Case No. 27A02-1708-CT-1956 |
| v. | Interlocutory Appeal from the Grant Circuit Court |
| Kyle O'Bryan and Megan O'Bryan, | The Honorable Mark E. Spitzer, Judge |
| *Appellees-Plaintiffs/Counterclaim-Defendants.* | Trial Court Cause No. 27C01-1703-CT-22 |

**Bailey, Judge.**

## Case Summary

Great Lakes Anesthesia, P.C. ("Great Lakes") brings an interlocutory appeal to challenge the denial of its motion for a preliminary injunction to restrain its former employees, Kyle O'Bryan and Megan O'Bryan ("the O'Bryans"), from

performing nurse-anesthesia services for Associated Anesthesiologists of Fort Wayne ("AAFW") at Marion General Hospital ("the Hospital"), pending resolution of a declaratory judgment action, counterclaim, and third-party claim relative to a covenant not to compete within the O'Bryans' employment contracts with Great Lakes. Great Lakes presents the single consolidated issue of whether the trial court's judgment is contrary to law. We affirm.

## Facts and Procedural History

The facts most favorable to the judgment are as follows. In the summer of 2016, the O'Bryans, who are married and work as certified registered nurse anesthetists ("CRNAs"), responded to a job posting listed by Great Lakes on an internet website.[1] The O'Bryans engaged in recruitment discussions with Courtney Morrison ("Morrison"), the special assistant to the Chief Executive Officer ("CEO") of Great Lakes. At that time, the O'Bryans lived in Georgia and wished to re-locate closer to family members in the Midwest. They also desired to decrease their travel time from home to work and minimize their time spent apart, assigned to different locations. The O'Bryans explained these considerations to Morrison. Morrison initially offered the O'Bryans positions in Crown Point, Indiana. Concluding that it would be difficult to meet the

---

[1] Great Lakes provides anesthesia, pain management, and obstetric services to hospitals and surgery centers in northeastern Indiana. Great Lakes employs anesthesiologists, who are licensed physicians, and CRNAs, who are registered nurses specially trained and certified to provide anesthesia to patients. AAFW is Great Lakes' primary competitor in northeastern Indiana.

requisite thirty-minute response time[2] from their desired home location, the O'Bryans declined the positions. Morrison responded by asking them not to seek other employment and to allow her to find suitable positions for them.

[3] Morrison began efforts to recruit the O'Bryans for positions in Grant County. Great Lakes was then contracted with Marion Anesthesiologists ("MA") to provide anesthesiology services; MA had a contract with the Hospital. Although Great Lakes was a sub-contractor, it was attempting to secure a direct contract with the Hospital in anticipation of the dissolution of MA. Great Lakes assured the O'Bryans that it had a good relationship with the Hospital. According to the O'Bryans, they were repeatedly told that Great Lakes had a contractual relationship with the Hospital.

[4] On August 4, 2016, the O'Bryans signed employment agreements drafted by Great Lakes ("the Agreements"), providing in relevant part:

> Restrictive Covenants. Upon termination, other than if Employee terminates this Agreement for cause, Employee agrees not to provide anesthesia services, directly or indirectly, for a period of twenty four (24) months at the specific facilities where Corporation has assigned Employee to provide anesthesia services, along with any facilities in a twenty five (25) mile radius, within the twenty four (24) month period immediately prior to the termination date (the "Restricted Area"). The Employee recognizes that the Corporation will suffer great loss

---

[2] Many medical facilities require that a provider of anesthesia services must be able to be at a patient's bedside within thirty minutes of the facility call to the provider. When a service provider who is on call lives in a location that does not permit this rapid response time, he or she typically will stay overnight at or near the medical facility.

and damage if the Employee should compete with the Corporation or disclose confidential information in violation of Section 5.3. The Employee understands and agrees that the Corporation has a substantial investment in the good will of the Corporation's healthcare practice and the right to protect such practice by the restrictive covenants contained in this Agreement. In making these covenants, the Employee represents and warrants to the Corporation that the Employee's experience and capabilities are such that the Employee can obtain employment outside of the Restricted Area in the specialty of anesthesiology and that the enforcement of these covenants will not prevent the Employee from earning a livelihood outside the Restricted Area. As a result, the parties agree as follows:

(a) The Employee's breach of any of the restrictive covenants contained in Sections 4.5 or 5.3 will entitle the Corporation to injunctive relief, as well as compensation for damages incurred because the Corporation's remedy at law will be inadequate.

(b) If the Corporation institutes an action against the Employee for breach of this covenant against competition, or if the Employee institutes an action to challenge the Corporation's ability to enforce any of the covenants contained in Sections 4.5 or 5.3., the losing party will pay the prevailing party's reasonable attorney fees, costs, and expenses of litigation, such as expert witness fees.

(c) If a court should enter injunctive relief in favor of the Corporation and against the Employee, the Corporation shall not be required to post a bond or other security.

(d) If a court should declare all or part of any restrictive covenant contained in Section 4.5 or 5.3 unenforceable because of any unreasonable restriction, the Corporation and the Employee

agree that the court shall have the express authority to reform this Agreement to provide for reasonable restrictions.

(e) If the Employee is found to be guilty of violating the restrictive covenant contained in this Section 4.5, the duration of the covenant will automatically be extended to include the period of violation.

(f) The prohibited acts contained in Sections 4.5 and 5.3 shall be construed as independent of any other provision of this Agreement and shall survive the termination of this Agreement. The existence of any claim or cause of action of the Employee against the Corporation, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Corporation of any or all of such prohibited acts.

(App. Vol. II, pgs. 42-43.) The O'Bryans relocated from Georgia and began working for Great Lakes in November of 2016. They were assigned, primarily, to perform services at the Hospital; they were sometimes assigned to provide services at two other hospitals.

In January of 2017, Seth Claxton ("Claxton") became the new CEO of Great Lakes. Having had little involvement with the prior negotiations between Great Lakes and the Hospital, he believed that a contract between them was inevitable and the parties just needed to finalize details. However, Claxton learned that the Hospital had been in discussions with AAFW and might be extending a contract to AAFW. In mid-February, Claxton took part in a telephone conference with the CEO of the Hospital, Stephanie Hilton-Siebert ("Hilton-Siebert"). At that time, Hilton-Siebert expressed some concerns about

Great Lakes' pricing and performance and revealed that discussions with AAFW had taken place. Claxton responded with an ultimatum, giving the Hospital two weeks to decide if the Hospital would contract with Great Lakes; if not, Great Lakes was to stop providing services at the Hospital pursuant to its contract with MA. Hilton-Siebert decided not to enter into a contract with Great Lakes, because of the ultimatum.

[6] On April 1, 2017, Claxton gave notice to MA that Great Lakes was terminating its contract with MA and would cease providing services under that contract in thirty days. With this tactic, risking a gap in the provision of anesthesiology services at the Hospital, Great Lakes hoped to pressure the Hospital or improve the bargaining position of Great Lakes. After learning they would no longer be based at the Hospital, the O'Bryans asked to be released from the Agreements; Great Lakes refused.

[7] Great Lakes issued its CRNA assignment schedule for April of 2017. The O'Bryans were scheduled for fewer shifts, to be worked at hospitals that were more than thirty minutes from their home, necessitating overnight stays. AAFW contacted Great Lakes, offering to buy out the O'Bryans' employment agreements; Great Lakes refused. On March 31, 2017, each of the O'Bryans tendered a resignation, effective immediately, to Great Lakes.

[8] As of April 1, 2017, at 6:00 a.m., Great Lakes no longer provided anesthesia services at the Hospital pursuant to its contract with MA. The O'Bryans began

providing services at the Hospital, pursuant to agreements with AAFW, beginning on April 3, 2017.

[9] On the day of their resignation, March 31, 2017, the O'Bryans filed a four-count complaint against Great Lakes. They sought a declaratory judgment that the non-compete covenants were unenforceable. They also alleged fraudulent inducement, fraud, and promissory estoppel. Great Lakes filed a counterclaim against the O'Bryans and also filed a motion for a preliminary injunction, asking that the O'Bryans be enjoined from providing services at the Hospital. Great Lakes subsequently filed an amended counterclaim and third-party claim. Great Lakes asserted that the Hospital, AAFW, and the CEOs of each entity, personally, had tortiously interfered with a contractual relationship. The Hospital filed a counterclaim against Great Lakes, alleging that the Hospital was due $250,000.00 for unreimbursed billings.

[10] On May 31 and June 12, 2017, the trial court heard evidence pertaining to the motion for a preliminary injunction. On August 2, 2017, the trial court entered findings of fact, conclusions thereon, and an order denying the motion for a preliminary injunction. Great Lakes brings this interlocutory appeal as of right.[3]

---

[3] Indiana Appellate Rule 14(A)(5) provides that an appeal may be taken "as a matter of right" from an interlocutory order "[g]ranting or refusing to grant, dissolving, or refusing to dissolve a preliminary injunction."

# Discussion and Decision

## Standard of Review

[11] An injunction is an extraordinary equitable remedy, which should be granted only "in rare instances in which the law and facts are clearly within the moving party's favor." *Barlow v. Sipes*, 744 N.E.2d 1, 5 (Ind. Ct. App. 2001), *trans. denied*. To obtain a preliminary injunction, the moving party must demonstrate by a preponderance of the evidence: a reasonable likelihood of success at trial; the remedies at law are inadequate; the threatened injury to the movant outweighs the potential harm to the nonmoving party from the granting of an injunction; and the public interest would not be disserved by granting the requested injunction. *Cent. Ind. Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 727 (Ind. 2008). To show a reasonable likelihood of success at trial, the moving party must establish a prima facie case. *Norlund v. Faust*, 675 N.E.2d 1142, 1149 (Ind. Ct. App. 1997), *clarified on denial of reh'g*, 675 N.E.2d 1142.

[12] We review a trial court's grant or denial of a preliminary injunction for an abuse of discretion. *Cent. Ind. Podiatry*, 882 N.E.2d at 727. When a movant has failed to meet any one of the four requirements for seeking the issuance of a preliminary injunction, the trial court does not abuse its discretion in denying relief. *Zimmer, Inc. v. Davis*, 922 N.E.2d 68, 74 (Ind. Ct. App. 2010).

[13] Pursuant to Indiana Trial Rule 52(A), "[t]he court shall make special findings of fact without request in granting or refusing preliminary injunctions." When we consider whether the trial court has abused its discretion regarding a

preliminary injunction, we determine whether the evidence supports the trial court's special findings of fact and whether the findings support the judgment. *Hannum Wagle & Cline Eng'g, Inc. v. American Consulting*, 64 N.E.3d 863, 874 (Ind. Ct. App. 2016). We do not disturb the findings or judgment unless they are clearly erroneous. *Id.* We do not reweigh the evidence or assess witness credibility. *Id.* Rather, we consider only the evidence favorable to the judgment and the reasonable inferences to be drawn therefrom. *Id.* We will reverse the trial court's judgment only when it is clearly erroneous, that is, when our review of the record leaves us with a firm conviction that a mistake has been made. *Id.* Although we defer substantially to findings of fact under Trial Rule 52, we need not do so for conclusions of law. *McCauley v. Harris*, 928 N.E.2d 309, 313 (Ind. Ct. App. 2010), *trans. denied*.

[14] Also, because Great Lakes bore the burden of proof upon its motion for injunctive relief and now appeals from a negative judgment, "it must demonstrate that the trial court's judgment is contrary to law; that is, the evidence of record and the reasonable inferences therefrom are without conflict and lead unerringly to a conclusion opposite that reached by the trial court." *Primecare Home Health v. Angels of Mercy Home Health Care, LLC*, 824 N.E.2d 376, 380 (Ind. Ct. App. 2005).

## Analysis

[15] Great Lakes contends that it presented evidence to establish each of the factors necessary for a grant of injunctive relief and that the trial court misapplied the

law. Great Lakes does not acknowledge that it appeals from a negative judgment, nor concede that the denial is not an abuse of discretion if there was a failure of proof on any one of the requisite factors. *Zimmer*, 922 N.E.2d at 74. Primarily, Great Lakes presents voluminous factual arguments, emphasizing its own interpretation of the facts. Nonetheless, we will endeavor to consider Great Lake's arguments with reference to the appropriate standard of review.

[16] <u>Reasonable Likelihood of Success at Trial</u>. Covenants not to compete in employment contracts are in restraint of trade and are disfavored by the law. *Cent. Ind. Podiatry*, 882 N.E.2d at 728-29. The covenants are strictly construed against the employer and will be enforced only if reasonable. *Id.* at 729. Covenants must be reasonable with respect to the legitimate interests of the employer, restrictions on the employee, and the public interest. *Titus v. Rheitone, Inc.*, 758 N.E.2d 85, 92 (Ind. Ct. App. 2001), *trans. denied*. The ultimate determination of the reasonableness of a restrictive covenant is a question of law, but its reasonableness must rest upon adequate facts. *Raymundo v. Hammond Clinic Ass'n*, 449 N.E.2d 276, 279 (Ind. 1983).

[17] In determining the reasonableness of the covenant, we first examine whether the employer has asserted a legitimate interest that may be protected by a covenant. *Cent. Ind. Podiatry*, 882 N.E.2d at 729. If the employer has asserted a legitimate, protectable interest, we next determine whether the scope is reasonable in terms of time, activity, and geographic area restricted. *Id.* The employer must show the covenant is "necessary in light of the circumstances" or, "in other words, the employer must demonstrate that the employee has

gained a unique competitive advantage or ability to harm the employer before such employer is entitled to the protection of a noncompetition agreement." *Gleeson v. Preferred Sourcing, LLC*, 883 N.E.2d 164, 172-73 (Ind. Ct. App. 2008).

[18] Here, the trial court concluded that Great Lakes did not have a protectable interest in enforcing the non-compete covenants because Great Lakes had elected, as of April 1, 2017, to no longer provide anesthesia services at the Hospital. Moreover, Great Lakes was not providing anesthesia services elsewhere in Grant County and there was no evidence that Great Lakes lost patients because the O'Bryans were working for AAFW at the Hospital. The trial court also observed that, by permitting its independent contractors to work at facilities not served by Great Lakes, but within 25 miles of Great Lakes-served facilities, Great Lakes implicitly recognized that "patients do not make a choice about medical care on the basis of a CRNA." Appealed Order at 12. Additionally, the trial court concluded that Great Lakes failed to present evidence that the 25-mile geographic restriction was reasonable.

[19] The trial court's factual findings have evidentiary support. Indeed, Great Lakes does not dispute that it ended its provision of services to MA at the Hospital on April 1, 2017, now provides no other anesthesia services in Grant County, and permits its independent contractors to provide anesthesia services for various medical providers without a 25-mile restriction relative to Great Lakes' activities. Although Great Lakes concedes that it does not currently provide anesthesia services in Grant County, it argues that it nevertheless has a legitimate interest in restricting the O'Bryans because the O'Bryans were "hired

to develop" goodwill with the Hospital and "could not leverage that goodwill for their own benefit or transfer it to AAFW." Appellant's Brief at 36.

[20] Goodwill can include secret or confidential information, such as customer lists, and also "the advantage acquired through representative contact." *Gleeson*, 883 N.E.2d at 173. However, an employer is not entitled to the protection of the employee's use of his knowledge, skill, or information acquired or increased through work experience or enhanced from instruction received during employment. *Buffkin v. Glacier Grp.*, 997 N.E.2d 1, 11 (Ind. Ct. App. 2013).

[21] The nature of the industry is a proper focus:

> In industries where personal contact between the employee and the customer is especially important due to the similarity in the product offered by the competitors, the advantage acquired through the employee's representative contact with the customer is part of the employer's good will, regardless of whether the employee had access to confidential information. … If an employee is hired in order to generate such good will, she may be enjoined from subsequently contacting those customers or using that good will to her advantage. … Indeed, Indiana courts have held that a salesperson may be restrained from contacting former customers within her previous sales area. … There is a personal nature to the relationship between a salesperson and customer, and many times the customer's only contact with the company is through the salesperson.

*Gleeson*, 883 N.E.2d at 173 (internal citations omitted.). Great Lakes contends that the O'Bryans were hired to "develop goodwill" between Great Lakes and

the Hospital,[4] specifically by "providing excellent anesthesia services and maintaining effective liaison with surgeons and other physicians who may require anesthesia services." Appellant's Brief at 37. Accordingly, Great Lakes equates the CRNA position with that of a salesperson or liaison.

[22]     In *Norlund*, a panel of this Court observed that "the law recognizes a protectable interest in the goodwill generated between a customer and a business" and "[i]f an employee is hired in order to generate such good will, he may be enjoined from subsequently contacting those customers or using that good will to his advantage." 675 N.E.2d at 1152. Faust, an ophthalmologist, hoped to grow his business and decided to hire an optometrist, Norlund, both as a medical optometrist and as an "optometric liaison, building referral relationships with other area optometrists." *Id.* at 1146. Norlund signed an employment agreement that included a non-compete clause. Faust's business increased dramatically, but the parties ended their relationship during renegotiation of the contract. Two weeks after Faust terminated Norlund's employment, Norlund assisted his wife, also an optometrist, to set up a competing "essentially identical" business. *See id.* at 1147. The trial court enjoined Norlund from

---

[4] Great Lakes places the focus upon goodwill between its former CRNA employees and the Hospital and claims that the trial court erroneously focused upon goodwill between CRNAs and patients. According to Great Lakes, it "argued that its protectable interest lay in its goodwill with [the Hospital], not with the hospital's patients." Appellant's Brief at 38. Great Lakes insists that the trial court failed to address this argument and claims that its "real customer" was the Hospital. Appellant's Brief at 42. Great Lakes' contentions ignore its position vis-à-vis the Hospital, that is, Great Lakes never had a contractual relationship with the Hospital or provided services directly for the Hospital. Great Lakes' customer was MA.

contacting any of the 122 optometrists who had referred patients to Faust Eye Center. *See id.* This Court found that provision of the court order to be valid:

> Indiana courts have decided that a salesman may be restrained from contacting his former customers within his previous sales area. There is a personal nature to the relationship between the salesperson and customer, and many times, the customers' (in this case the referring optometrists') only contact with the company is through the salesperson. Although R. Norlund was not a "salesman" per se, we reason to apply those cases by analogy.
>
> R. Norlund was employed by Faust to generate good will between Faust and the area optometrists. Although Faust does not have a protectable interest in the patients of those optometrists, Faust does have an interest in the good will created by R. Norlund on Faust's behalf. Therefore, that interest is protectable and the action of the trial court enjoining R. Norlund from contacting any of the optometrists as outlined in the court's order sections 3 and 4 is valid.

*Id*. at 1154-55.

[23] Although Norlund was not a salesman in the traditional sense, he was hired to increase Faust's business by making direct overtures for new business. During Norlund's employment, "Faust's optometric referrals increased from 20% to 80-90% of his business" and "[t]his increase was due to R. Norlund's activities developing the network on behalf of and funded by Faust." *Id.* at 1147. Here, by contrast, the evidence most favorable to the judgment indicates that the O'Bryans were hired to administer anesthesia to patients.

[24] Great Lakes' only customer was MA. *See Duneland Emergency Physician's Medical Grp., P.C. v. Brunk*, 723 N.E.2d 963, 966 (Ind. Ct. App. 2000) (where a physician was employed by Duneland and Duneland contracted with a hospital to provide emergency room staff, the only customer of Duneland was the hospital with which it contracted), *trans. denied*. Great Lakes expected the O'Bryans to provide "excellent service" and be "effective liaisons with physicians." Appellant's Brief at 37. One would reasonably anticipate that Great Lakes' contractual/customer relationship with MA would be *maintained* if the O'Bryans performed according to expectation. But Great Lakes does not point to evidence that the O'Bryans were hired to *increase* a customer base, akin to a traditional salesman or even a liaison for solicitation purposes, such as Norlund.[5] Nor were the O'Bryans in partnership with Great Lakes or engaged in profit-sharing. *See e.g.*, *Raymundo*, 449 N.E.2d at 279 (a non-compete covenant was valid when it "did nothing more than protect the Clinic's goodwill against piracy by a mutinous partner"). There is evidence to support the trial court's conclusion that the O'Bryans did not gain a competitive advantage to Great Lakes' detriment because of their interaction with health care providers at the Hospital.

[25] Great Lakes argues it has an "interest in competing for [the Hospital's] business in the future" and that the O'Bryans "harmed" Great Lakes' "ability to

---

[5] The *Norlund* Court observed: "What R. Norlund has been doing, and what he is restrained from, is acting as a salesman of sorts." 675 N.E.2d at 1154.

compete with AAFW for [the Hospital's] business in the future."  Appellant's Brief at 44-45.  Presumably, the "harm" caused by the O'Bryans is the performance of their services as CRNAs.  At the time that the O'Bryans executed non-compete agreements, Great Lakes had a protectable interest in providing services to MA at the work site of the Hospital.  The restrictions upon the O'Bryans, if imposed in an enforceable contract, would have arguably been necessary to protect Great Lakes' interest.

[26]  However, when contract negotiations turned sour, Great Lakes divested itself of an interest in performing services for its client, MA, at the Hospital.  Having terminated its interest, Great Lakes insists that it has a right to protect a possible future relationship with the Hospital.  This is not akin to a situation where customers have been lured away and might return.  *See e.g., Coffman v. Olson & Co., P.C.*, 906 N.E.2d 201 (Ind. Ct. App. 2009), *trans. denied*.  The speculation that Great Lakes might be offered a future contract by the Hospital is tenuous, at best, given that Great Lakes deliberately discontinued services to MA early – despite potential consequences to Hospital patients – as a bargaining chip.  The trial court did not err as a matter of law in finding that Great Lakes had no protectable interest in the provision of anesthesia services at the Hospital.

[27]  Also relevant to Great Lakes' likelihood of success at trial are the allegations of fraud.  There was evidence from which a fact-finder might conclude that the O'Bryans entered into the non-compete agreements due to Great Lakes' alleged

misrepresentations.[6] Megan testified that a Great Lakes recruiting representative told the O'Bryans that Great Lakes had a three-year contract with the Hospital, the Hospital and Great Lakes had a "great relationship," and the contract was "solid." (Tr. at 50.) Kyle testified that, when pre-closing documents were delivered pertaining to their new home, Megan contacted the recruiter for reassurances, which were forthcoming. The trial court stated that it had evaluated the testimony and the credibility of the witnesses, and it concluded that Great Lakes had "painted an overly rosy picture" of its relationship with the Hospital. (Appealed Order at 4.) The trial court described Great Lakes' representations as "at best overstated and at worst knowingly false representations," which were "the primary factor in the O'Bryans' decision to locate in Marion." (Appealed Order at 5.)

[28] In sum, the trial court was asked to decide whether Great Lakes would likely succeed at trial in enforcing non-compete covenants – allegedly procured without transparency – that would restrict medical services to patients in a geographic area Great Lakes does not now serve and, more particularly, at a Hospital with which Great Lakes never contracted. Such would be unreasonable, as it would "extend beyond the scope of the employer's legitimate interests." *Gleeson*, 883 N.E.2d at 175. The trial court's conclusion

---

[6] The O'Bryans have a pending claim against Great Lakes for fraudulent inducement, the elements of which claim are: (1) a material representation of past or existing facts which (2) was false, (3) was made with knowledge or reckless ignorance of its falsity, (4) was made with the intent to deceive, (5) was rightfully relied upon by the complaining party, and (6) proximately caused injury to the complaining party. *Tru-Cal, Inc. v. Conrad Kacsik Instrument Sys.*, 905 N.E.2d 40, 44-45 (Ind. Ct. App. 2009), *trans. denied*.

that Great Lakes failed to prima facie establish a reasonable likelihood of success at trial is not contrary to law.

[29] Alternatively, and without having advocated such in the trial court hearing, Great Lakes asserts that the trial court should have utilized the blue-pencil doctrine. "If a noncompetition agreement is overbroad and it is feasible to strike the unreasonable portions and leave only reasonable portions, the court *may* apply the blue pencil doctrine to permit enforcement of the reasonable portions." *Cent. Ind. Podiatry*, 882 N.E.2d at 730 (emphasis added). The doctrine permits excising language but not rewriting the agreement. *Id.*

[30] Great Lakes assumes for purposes of argument that the 25-mile restriction is unreasonable and argues that the trial court clearly erred by declining to apply the blue-pencil doctrine such that the O'Bryans are prohibited from providing services for AAFW at the Hospital. In effect, Great Lakes is claiming that it would have a greater likelihood of success on the merits at trial if the non-compete geographic restriction were modified. The grant of an injunction is an extraordinary equitable remedy and we are directed to no authority for the proposition that a trial court must sua sponte sever or modify terms of an agreement to support the imposition of the extraordinary remedy.

[31] Having determined that the trial court's conclusion as to the first factor, likelihood of success at trial, is not contrary to law, we need not address Great Lakes' contentions that the weight of the evidence was in Great Lakes' favor as to the remaining factors. *See Zimmer*, 922 N.E.2d at 74. However, because

Great Lakes contends that the trial court applied an erroneous standard of law, we elect to briefly address the application of the remaining factors.

[32] <u>Adequacy of Remedies at Law</u>. Great Lakes claims that the trial court failed to properly address the issues before it relative to Great Lakes' damages. Great Lakes describes at some length the staffing response and costs allegedly necessitated by the O'Bryans' early departure and argues "A preliminary injunction is a more practical and efficient means of remedying the O'Bryans' breach than money damages." Appellant's Brief at 59. The trial court observed that Great Lakes was seeking breach of contract damages based upon the O'Bryans' admitted failure to give 90-day notices but, according to the trial court, the breach and determination of damages, were "different issues for a different day." (Appealed Order at 15.)

[33] In *Cent. Ind. Podiatry*, our Indiana Supreme Court explained:

> Injunctive relief is not available where the breach can be adequately satisfied by money damages. *Ind. Family & Soc. Servs. Admin. v. Walgreen*, 769 N.E.2d 158, 162-68 n. 4 (Ind. 2002). However, a legal remedy is adequate only when it is "as plain and complete and adequate – or, in other words, as practical and efficient to the ends of justice and its prompt administration – as the remedy in equity." *Washel v. Bryant*, 770 N.E.2d 902, 907 (Ind. Ct. App. 2002).

882 N.E.2d at 732. Suffering mere economic damage will not entitle a party to injunctive relief, because damages are sufficient to make the party whole. *Gleeson*, 883 N.E.2d at 178.

[34]     In *Cent. Ind. Podiatry*, the Court found that it was "virtually impossible to quantify the profits diverted" when a podiatrist moved his practice. *Id.* at 733. This was because the effect of the move on new patients was "unlikely to be provable." *Id.* The Court "assume[d] that many patients choose their physicians based on referrals by other patients and word of mouth references from patients." *Id.* These considerations are not present here. The evidence before the trial court was that patients do not typically make surgery decisions based upon which CRNA is available. There was no evidence before the trial court that a patient had been referred to the Hospital, or a patient had decided to have his or her surgery at the Hospital, because of the availability of either of the O'Bryans. The trial court did not err as a matter of law by deferring the issue of damages, concluding that, if the O'Bryans are ultimately found liable for breach of contract, money damages are adequate.

[35]     Threatened Injury and Potential Harm. A court may issue injunctive relief only when the threatened injury to the moving party outweighs the potential harm to the nonmoving party. *Id.* Great Lakes' argument in this regard is that the trial court gave improper weight to the O'Bryans' potential harm. However, Great Lakes appeals a negative judgment and cannot predicate a reversal upon alleged improper weighing of conflicting evidence. *Hannum Wagle*, 64 N.E.3d at 874.

[36]     Public Disservice. Great Lakes argues that the trial court applied an incorrect legal standard in concluding that the public interest would be disserved by granting Great Lakes injunctive relief, because the trial court focused upon the early termination decision by Great Lakes, which could have left the Hospital

short-staffed and put citizens of Grant County at risk. Great Lakes observes that the question of public interest is addressed to the time when the preliminary injunction would issue as opposed to an earlier date. To the extent that the trial court focused on historical events, as opposed to the consequences flowing from the requested grant of equitable relief, the focus was arguably misdirected. Nonetheless, this does not render the judgment contrary to law. Great Lakes bore the burden of showing that the public would not be disserved by the grant of injunctive relief. Even assuming that it did so, the burden of proof was not met as to all requisite factors and thus, the trial court did not abuse its discretion by denying injunctive relief. *Zimmer*, 922 N.E.2d at 74.

# Conclusion

[37] We cannot say based upon our review of the record that the evidence and the reasonable inferences drawn therefrom are without conflict and lead unerringly to a conclusion opposite that reached by the trial court. The trial court's findings are supported by the evidence and the findings support the trial court's conclusion to deny Great Lakes injunctive relief.

[38] Affirmed.

Crone, J., and Brown, J., concur.