


FILED

Dec 09 2020, 10:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

I N  T H E

# Indiana Supreme Court

Supreme Court Case No. 18S-DI-553

## In the Matter of
## Michael A. Blickman,
*Respondent.*

---

Decided: December 9, 2020

Attorney Discipline Action

Hearing Officer Terry C. Shewmaker

---

**Per Curiam Opinion**

Chief Justice Rush and Justices David, Massa, and Goff concur.
Justice Slaughter concurs in part and dissents in part with separate opinion.

**Per curiam.**

For several months in the fall of 2015, a prominent high school instructor preyed upon a fifteen-year-old student. The discovery of this criminal conduct, and subsequent attempts to cover it up, triggered a sequence of events that culminated in the instructor's arrest and conviction, the school headmaster's suicide, and a deferred prosecution agreement reached between the school and federal authorities.

Today we are called upon to consider the role the school's outside counsel, Respondent Michael Blickman, played in these events. More specifically, we must determine whether the Indiana Supreme Court Disciplinary Commission has clearly and convincingly proven its allegations of professional misconduct against Respondent.

We find that Respondent's efforts to silence the victim and her family provided the school with incompetent representation and were prejudicial to the administration of justice. We find further that the Commission has failed to sustain its burden of proof on the remaining charges. For Respondent's professional misconduct, we conclude he should be publicly reprimanded.

# Procedural Background and Facts

This matter is before the Court on the report of the hearing officer we appointed to hear evidence on the Indiana Supreme Court Disciplinary Commission's disciplinary complaint filed against Respondent. Respondent's 1978 admission to this State's bar subjects him to this Court's disciplinary jurisdiction. *See* IND. CONST. art. 7, § 4.

At relevant times, Respondent was outside counsel for Park Tudor School. Early in the afternoon of December 14, 2015, the father ("Father") of a fifteen-year-old female student ("Student"), accompanied by counsel Rob Dassow, met with Respondent and Park Tudor Headmaster Matthew Miller and informed them that Father believed Kyle Cox, a teacher and coach at Park Tudor, had engaged in a series of inappropriate electronic sexual communications with Student. Father brought with him to the

meeting Student's laptop computer, which contained sexually graphic content exchanged between Student and an individual believed to be Cox, as well as printouts of text messages and a graphic screenshot image of Student. At Respondent's request, Father gave the laptop and printouts to Respondent at the conclusion of the meeting.

Respondent continued to meet with Miller for several hours after Father and Dassow left, during which time they discussed how to handle Cox's termination and manage public relations once they were able to confirm that Cox had been the individual communicating with Student. During this meeting Miller also asked Respondent if the matter had to be reported to the Department of Child Services (DCS). Respondent told Miller he was unsure of the answer and would have to research this. Respondent left the school around 7:30 p.m., keeping in his possession the materials Father had provided.

At approximately 7:00 a.m. the following morning, Respondent advised Miller by phone a report to DCS was required to be made and should be done right away.[1] Respondent offered to make the call himself, but Miller told Respondent that the school would make the report.

That same morning, Miller and associate headmaster Shants Hart met with Cox, who admitted he was the individual who had been communicating with Student. Miller immediately fired Cox. Later that day though, Park Tudor and Cox executed a written agreement drafted by Respondent whereby Park Tudor agreed to issue a public statement indicating Cox had resigned in exchange for Cox's agreement not to discuss the matter with anyone.

Hart, with Miller present, called DCS at approximately 2:00 p.m. on December 15 to report the matter. However, Miller had not fully or accurately informed Hart of the circumstances surrounding Cox's communications with Student. As a result, when DCS asked if any explicit images had been exchanged, Hart told DCS she did not know. Miller did

---

[1] Unbeknownst to Respondent at the time, Miller simultaneously sought a second opinion from a Massachusetts attorney, who provided Miller with substantially similar advice.

not correct this misleading statement and others despite having heard both the questions and answers on speakerphone. DCS also was not advised during this conversation of the materials Father had provided to Miller and Respondent. Respondent did not participate in this call and testified he did not learn until much later that the school's report to DCS was inaccurate and incomplete.

Later on December 15, Respondent discussed with Dassow a potential settlement between Park Tudor and Student's family and began drafting an agreement. Respondent sent the draft agreement to Miller on December 16 for his review and to Dassow on December 17 for his review. Among other things, the proposed agreement included a confidentiality clause that prohibited Student and her family from disclosing matters involving her relationship with Cox "to any other person or entity" besides Dassow and Student's therapist.[2] This proposed agreement was never executed.

On December 16, Respondent instructed a computer specialist at his law firm to make copies of the sexually graphic images and texts and to place those copies on a thumb drive rather than on the firm's network. Respondent then placed the thumb drive in a sealed envelope in a cabinet in his office and returned the laptop to Park Tudor, which in turn returned it to Father.

During the next two weeks, DCS and law enforcement personnel reached out to Father and Student, learned of the materials Father had provided to Park Tudor, and scheduled an interview of Student for January 4. When Respondent learned of the scheduled interview with Student, Respondent emailed Dassow, writing that "[d]iscussions with [DCS] and/or IMPD would not be permitted under the agreement" and that "Park Tudor will reevaluate the appropriateness" of entering the

---

[2] Father testified that Student's therapist had been referred to the family by Miller and Respondent during the December 14 meeting, and that Father later learned "part of the agreement that we signed with [the therapist's] agency included his ability to share [Student's] case file with the school." (Tr. Vol. 1 at 59, 68).

agreement "if discussions with [DCS] or IMPD do occur." Father then cancelled the DCS interview.

On January 5, police went to Park Tudor and attempted to interview Hart, who referred them to Respondent. At the same time police also attempted to interview Miller, but Miller was "literally hiding" somewhere at the school and could not be located. (Tr. Vol. 1 at 175). Respondent refused to provide police with further information.

On January 6, Respondent and Dassow called Marion County Prosecutor Terry Curry hoping to persuade Curry that an investigation would not be in Student's best interests. Respondent did not disclose that he had copies of the evidence from Student's computer, nor did he disclose that he had refused to discuss the matter with law enforcement the previous day. After this call, Curry instructed law enforcement to move forward with search warrants.

On January 7, police executed search warrants at Cox's home, Park Tudor, and Student's home. At the school, Miller was angry and belligerent toward officers, and Respondent was summoned to the scene. Miller denied that Park Tudor was in possession of the materials Father had provided and claimed not to know where the materials were. Respondent initially told police he did not know where the materials were but they were not at the school. At some point after Respondent conferred privately with Miller though, Respondent informed police he had copies of the materials at his office, but he asserted those materials were privileged. After again conferring privately with Miller, Respondent told police that Miller was willing to waive privilege and that Respondent would turn over the materials. Respondent attempted to avoid doing so until the following day, but the police refused to delay and escorted Respondent to his office to retrieve the copies.

The next day, after the warrants had been executed and Respondent had turned over the materials to police, Respondent sent another email to Dassow indicating that "no obligation of confidentiality shall restrict or limit the ability of the parties . . . to . . . truthfully respond to any inquiry by any authorized law enforcement officer." (Ex. Vol. at 486).

In the following weeks, Miller committed suicide, Cox was indicted in federal court, and Park Tudor's board of directors fired Respondent. Later in 2016, Cox was convicted and sentenced to 14 years in prison, and Park Tudor entered into a deferred prosecution agreement with the United States Attorney's Office under which a prosecution of the school for misprision of a felony would be conditionally deferred. In 2017, Student and her parents entered into a settlement agreement with Park Tudor and Respondent's law firm.

In November 2018, the Commission filed a disciplinary complaint against Respondent, which it later amended. The complaint as amended alleged Respondent violated the following Rules of Professional Conduct:

> 1.1: Failing to provide competent representation.
>
> 1.2(d): Counseling or assisting a client in conduct the lawyer knows to be criminal or fraudulent.
>
> 8.4(b): Committing criminal acts that reflect adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer.
>
> 8.4(d): Engaging in conduct prejudicial to the administration of justice.

A four-day evidentiary hearing was held in September 2019, followed by the parties' submission of post-hearing briefing. The hearing officer issued a detailed 24-page report on April 16, 2020. As discussed further below, the hearing officer found that Respondent violated Professional Conduct Rule 1.1 and that the Commission had not sustained its burden of proof on the remaining charges, and the hearing officer recommended Respondent be reprimanded.

# Discussion and Discipline

The Commission has petitioned for review of the hearing officer's conclusions in favor of Respondent, and in his response brief Respondent invites review of the hearing officer's conclusion that he violated Rule 1.1.[3]

The Commission carries the burden of proof to demonstrate attorney misconduct by clear and convincing evidence. *See* Ind. Admission and Discipline Rule 23(14)(g)(1). While our review process in disciplinary cases involves a *de novo* examination of all matters presented to the Court, the hearing officer's findings receive emphasis due to the unique opportunity for direct observation of witnesses. *See Matter of Keiffner*, 79 N.E.3d 903, 905 (Ind. 2017).

**1. Efforts to silence Student and her family.** The hearing officer concluded that Respondent's efforts to prevent Student and her family from cooperating with law enforcement and DCS amounted to incompetent representation in violation of Rule 1.1. Respondent challenges this conclusion, while the Commission argues that Respondent's actions violated both Rules 1.1 and 8.4(d). We agree with the Commission.

Respondent argues he did not perform incompetently in this regard because the confidentiality provision was included in the proposed settlement agreement at the mutual wish of both Park Tudor and the Student's family, Respondent reasonably believed all required reporting already had been done, and neither the family nor Park Tudor had any further duty to disclose information or to cooperate. We observe initially that Respondent's argument is belied by his own conduct. If the confidentiality provision truly had been mutually intended to encompass communications with DCS and law enforcement, there would have been no need for Respondent to send an email to Dassow on January 4 (the date Student's family had agreed to meet with DCS) threatening to pull out of the proposed settlement if the family went forward with the meeting.

---

[3] Respondent also has filed a motion for oral argument, which we deny.

More importantly, Respondent's professed belief that Park Tudor had made a full disclosure of all relevant facts and circumstances to DCS on December 15, including the existence of illicit texts and pornographic content, undercuts rather than supports his claim of professional competence. If Respondent believed that full disclosure already had occurred, it is difficult to conceive what legitimate objective might be gained from preventing either Park Tudor personnel or the Student's family from speaking with DCS or law enforcement during any follow-up on that initial report. As the hearing officer succinctly concluded, "[n]o adequate or logical explanation has been advanced by [Respondent]. No legitimate reason exists. It is pure and simple against public policy." (HO's Report at 19). Respondent's pursuit of this aspect of the confidentiality agreement not only lacked legitimate purpose, it ultimately was a significant contributing factor to the reputational harm and criminal exposure suffered by his client. (*See* Ex. Vol. at 138 (deferred prosecution agreement citing the proposed confidentiality agreement as one of several grounds subjecting Park Tudor to prosecution for misprision of a felony)).

The same facts and conclusions cited by the hearing officer in this regard also point to a Rule 8.4(d) violation for conduct prejudicial to the administration of justice. Although the hearing officer did not directly explain his reasoning for declining to find a Rule 8.4(d) violation, we surmise three possible reasons from findings made elsewhere in his report: (1) the settlement agreement was never executed; (2) Respondent's actions ultimately did not cause Student or her family to refuse to cooperate with DCS or law enforcement; and (3) Respondent later clarified in his January 8 email to Dassow that the confidentiality provision in the proposed settlement agreement did not prohibit communications with DCS or law enforcement. (HO's Report at 22-24).

The fact the settlement agreement was never executed is inapposite to a Rule 8.4(d) analysis, because it is the impropriety of the demand that gives rise to the violation. *See, e.g.*, *Matter of Campanella*, 56 N.E.3d 631 (Ind. 2016) (finding violation of Rule 8.4(d) where attorney threatened to file a disciplinary grievance against opposing counsel if a settlement demand was not met); *Matter of Halpin*, 53 N.E.3d 405 (Ind. 2015) (finding violation of Rule 8.4(d) where attorney threatened to press criminal charges against

the opposing party and disciplinary charges against opposing counsel if they did not accede to the attorney's demands for a venue change). And here, the demand made by Respondent was plainly improper, not simply because it was contrary to public policy but because it actively sought to subvert justice. After all, had the efforts to silence those involved been successful, the result would have been to shield Cox from answering for his crimes and to turn loose a child predator to teach and coach at another unsuspecting school.

Father's testimony in this matter draws a clear causal connection between Respondent's January 4 email and the cancellation of the DCS interview. (Tr. Vol. 1 at 98-99). That Father did not cite Respondent's demand for confidentiality when he called DCS to cancel the interview is hardly surprising, nor does it cure the violation that occurred when the improper demand was made. Respondent's January 8 email to Dassow similarly was not curative under the circumstances. By the time Respondent sent this email, search warrants already had been executed at the school and Student's home, and Respondent had been forced to disclose the existence of and turn over the materials in his possession. In context, this email was not a clarification or withdrawal of the improper demand but rather an acknowledgement that the wall of secrecy already had been involuntarily breached.

For the reasons set forth above, we conclude that Respondent's attempts to prevent Student and her family from cooperating with DCS or law enforcement amounted to incompetent representation in violation of Rule 1.1 and conduct prejudicial to the administration of justice in violation of Rule 8.4(d).

**2. Timeliness of advice to make DCS report.** The hearing officer concluded the timing of Respondent's advice to Miller was reasonable under the circumstances and did not violate either Rule 1.1 (incompetence) or 1.2(d) (counseling or assisting a criminal act) as alleged by the Commission. The Commission seeks review, arguing both rules were violated.

The hearing officer's analysis and the parties' arguments depend heavily on *C.S. v. State*, 8 N.E.3d 668 (Ind. 2014), a case in which a high

school principal was convicted at a bench trial of failing to "immediately" report a suspected incident of child abuse to DCS or law enforcement as required under the Indiana Code. In *C.S.*, the principal learned at approximately 12:30 p.m. that a student allegedly had been raped by another student in a bathroom at the school. School staff alerted the victim's residential custodian, and during the next few hours the principal and other school personnel attempted to investigate the rape on their own while also attending to unrelated administrative tasks. During this time the principal repeatedly declined to contact the police when asked, even though there were several police officers stationed in the school. The principal, assisted by other school personnel, did not contact DCS until 4:30 p.m.

We affirmed the principal's conviction for failing to timely report the matter, holding among other things that the evidence was sufficient to support the factfinder's determination that the principal either knew or should have known that the alleged rape amounted to "child abuse" and that he did not make his report "immediately." In so holding, we emphasized that the immediacy element "is necessarily a case-specific and fact-specific question" and "the length of the delay is not the only thing that matters. What also matters is the urgency with which the person files the report, the primacy of the action, and the absence of an unrelated and intervening cause for delay." *Id.* at 691. Our affirmance of the principal's conviction in *C.S.* was not unanimous; a dissenting opinion would have applied the rule of lenity, noting "[t]he charged offense requires reference to no fewer than five separate statutory provisions contained in two different titles and four different articles of the Indiana Code" and "[t]he statutes at issue are ambiguous, confusing, complex, and interwoven." *Id.* at 692-93.

*C.S.* was issued a little less than two years prior to the events in question here. It was, and remains, the leading case in Indiana addressing the reporting requirement. However, Respondent – an employment law attorney serving as outside counsel for Park Tudor and whose client base was about 20% educational – testified that at the time this matter arose he was unfamiliar with *C.S.* and only passingly familiar with the mandatory reporting statutes. Accordingly, when Miller asked Respondent mid-

afternoon on December 14 if the school was required to make a report, Respondent indicated he did not know and would have to research this. Respondent left the school around 7:30 p.m., awoke very early the following morning to research the question, and notified Miller by phone at approximately 7:00 a.m. that an immediate report was required.

The Commission's expert witness testified in this matter "that most lawyers who represent schools would be familiar with the child abuse reporting requirements of state law because it comes up so often" and noted the importance of these requirements had been reinforced and publicized amongst school professionals and lawyers in the wake of *C.S.* (Tr. Vol. 3 at 770-72). Without question, it would have been better for an attorney such as Respondent with a significant educational client base to have been more immediately familiar with the reporting requirements. But Rule 1.1 does not demand perfection or even specialized expertise from attorneys. Rather, it demands competency and explicitly anticipates, both in the text of the rule and its commentary, that preparation and research frequently will be necessary to meet the needs of the representation. Here, the hearing officer found Respondent "acted reasonably and timely by researching the law on the requirement of reporting the incident to DCS." (HO's Report at 13). The complexity of the reporting statutes, the Commission's clear-and-convincing burden of proof, and the deference we accord to the findings of the hearing officer, collectively persuade us (albeit narrowly) to find in Respondent's favor on this Rule 1.1 charge.

We likewise find in Respondent's favor on the Rule 1.2(d) charge. While it is abundantly clear from the record before us that Miller did not timely report the matter to DCS, and indeed was doing everything in his power to avoid having to report, there is scant evidence that Respondent counseled Miller's criminal conduct or knowingly assisted it. Regardless of whether Respondent should have known of the reporting requirement when Miller first asked him on December 14, the evidence is undisputed that Respondent did not know and accurately advised Miller that he did not know at that time. Nor did Respondent remain willfully ignorant thereafter; rather, after concluding his meeting with Miller around 7:30 p.m., Respondent awoke in the wee hours of the following morning to

research the issue, notified Miller around 7:00 a.m. a report was required and should be made "right away," and was told by Miller in response "All right. We will." (Tr. Vol. 3 at 609). Respondent even offered to make the report himself and had his secretary obtain the contact information, but Miller again told Respondent that the school would report. (*Id.* at 609-612). Miller inexcusably delayed about seven more hours before having Hart make the report, and Miller took steps to cause Hart's report to be materially misleading and incomplete, but Respondent was not aware of any of this until much later.

The Commission points to Respondent's awareness that Miller did not want to make a report if one was not mandatory. But awareness of Miller's preferences, by itself, falls well short of establishing that Respondent counseled or assisted Miller in criminal conduct. The Commission also points to two prior incidents in which Respondent had briefly discussed with Park Tudor personnel other instances of possible child abuse. One of these, disconcertingly, also had involved allegations of inappropriate texts by Cox, while the other instance had involved physical contact between two students in a stairwell. But a different attorney had assisted Miller in the prior investigation of Cox, and Respondent's role in that matter largely was limited to documenting the concluded investigation in his file. And while Respondent did play a more active legal role in response to the stairwell incident, including examining whether a report to DCS or law enforcement had to be made, the student-to-student physical contact at issue there differed substantially from the teacher-to-student sexting at issue here. These prior incidents certainly should have alerted Respondent to the recurrence of these types of issues in school settings and the benefit of better familiarizing himself with the reporting requirements in order to serve his educational client base. However, under the circumstances they offer negligible inferential support for the Commission's allegation that Respondent counseled or knowingly assisted Miller's criminal conduct in this matter.

**3. Failing to directly report the matter to DCS.** Thus far we have addressed Respondent's role in Miller's failure to timely report this matter to DCS. But the Commission also charged Respondent with a Rule 8.4(b) violation based on Respondent's failure to report the matter

directly, and it now seeks our review of the hearing officer's determination that Respondent did not violate this rule. We agree with the hearing officer and find no violation.

Rule 8.4(b) has two essential elements, both of which must be found by clear and convincing evidence before a violation may be found: the lawyer must have (1) committed a criminal act (2) that reflects adversely on the lawyer's honesty, trustworthiness, or "fitness as a lawyer in other respects." *See Matter of Hill*, 144 N.E.3d 184, 190 (Ind. 2020).

Indiana's reporting statutes generally require *anyone* who becomes aware of possible child abuse to report the matter to DCS or to local law enforcement. I.C. § 31-33-5-1. As applied to an attorney though, this requirement may come into tension with the confidentiality provisions of Professional Conduct Rule 1.6. Whether an attorney who learns of possible child abuse during the course of representing a client[4] has a duty to report is a question of considerable academic debate and has not been addressed by this Court.

In mid-2015, the Legal Ethics Committee of the Indiana State Bar Association issued an advisory opinion examining this question, which it described as "a difficult one on which reasonable, conscientious lawyers can disagree." In sum, the Committee concluded that "the lawyer's duty of confidentiality is generally paramount over the general duty to report." More specifically, because the confidentiality provisions of Rule 1.6 permit an attorney to reveal otherwise confidential information "to prevent reasonably certain death or substantial bodily harm," the Committee opined that in such limited circumstances the permissive maintenance of confidentiality under Rule 1.6 should yield to the mandatory reporting required by statute, and therefore an attorney *must* report suspected child

---

[4] The Commission points out that Respondent learned of the possible child abuse from a third party (Father) and not from his client, but the commentary to Rule 1.6 makes clear this is a distinction without a difference here. "The confidentiality rule . . . applies not only to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source." Prof. Cond. R. 1.6, cmt. [3].

abuse if the attorney believes it necessary "to prevent reasonably certain death or substantial bodily harm." In all other instances involving lesser harm though, the Committee concluded an attorney *may not* report information absent client consent. ISBA Legal Ethics Comm. Op. No. 2 (2015).

At the time this matter arose, other legal scholars had reached somewhat similar conclusions. *See* Donald R. Lundberg, "Mandatory Child Abuse Reporting by Lawyers," 55 Res Gestae 31, 32 (Dec. 2011) (positing that I.C. § 31-32-11-1's omission of attorney-client privilege from the list of common law privileges that do not require the exclusion of evidence in a judicial proceeding resulting from a failure to report possible child abuse demonstrates "the legislature believes the attorney-client privilege trumps the duty to report child abuse"); *see also* Megan M. Smith, Note, Causing Conflict: Indiana's Mandatory Reporting Laws in the Context of Juvenile Defense, 11 Ind. Health L. Rev. 439, 453-469 (2014) (discussing several reasons why attorneys should not be mandatory reporters). Illustrating though the ISBA's observation that reasonable minds can disagree, the view that client confidentiality generally prevails over mandatory reporting under Indiana's existing rules and statutes has not been universal. *See* Alberto Bernabe, "Through the Looking Glass in Indiana: Mandatory Reporting of Child Abuse and the Duty of Confidentiality," 92 Notre Dame Law Review Online 22 (2016).

We need not resolve today whether attorneys are subject to the Indiana Code's mandatory reporting requirements in connection with information obtained during the course of a representation. Assuming solely for the sake of argument they are, and assuming further that Respondent failed to comply with those requirements,[5] under the circumstances of this case any such criminality by Respondent lacks the requisite nexus to his professional fitness to support a Rule 8.4(b) violation. Simply put, possibly guessing incorrectly about an unsettled legal matter, upon which

---

[5] We acknowledge, but need not address, Respondent's argument that he would have been relieved of any statutory obligation to report once he reasonably believed Miller had made such a report. (Resp. Br. at 7 (citing I.C. § 31-33-5-3)).

reasonable minds can differ and indeed have differed, does not reflect adversely on Respondent's honesty, trustworthiness, or fitness as a lawyer.

**4. Possession of child pornography**. The Commission charged Respondent with a second Rule 8.4(b) violation based on Respondent's handling of the materials provided to him by Father, which the Commission alleges amounts to criminal possession of child pornography. *See* I.C. § 35-42-4-4 (2015); 18 U.S.C.A. § 2252(a) (2015). The Commission seeks review of the hearing officer's determination that no violation occurred. Although this Rule 8.4(b) allegation presents a much closer question, we nonetheless agree with the hearing officer and find no violation.

We begin with several straightforward observations. The materials at issue in this case included among other things a digitized image of Student's vagina. This image was a screenshot taken from a video on Student's laptop. (The computer specialist at Respondent's firm tried, but was unable, to copy the video). Father, Miller, and Respondent all knew that Student was fifteen years old. No argument has been advanced that the image and video do not depict sexual conduct, or that in context they have "serious literary, artistic, political, or scientific value." *See* I.C. § 35-42-4-4(c) (2015). Without question, this was child pornography.

Respondent argues his intent in possessing these materials was to preserve evidence in connection with Cox's termination. The hearing officer found as much and the Commission does not challenge this finding. But neither the state nor federal criminal statute requires the possessor to have acted with any prurient or financial intent or other nefarious motive. And while there is a safe harbor for a "school employee" whose possession of child pornography was "performed solely within the scope of the person's employment as a school employee," I.C. § 35-42-4-4(e) (2015), Respondent was outside counsel and not a school employee.

Still, there are problems with application of the expansive view urged by the Commission, which seemingly would ascribe criminality under these circumstances not only to Respondent's possession of these

materials but also to Father's possession of them. Moreover, much like the duty-to-report issue addressed above, application of these statutes to an attorney who comes into possession of the contraband during the course of representing a client has the potential in some circumstances to come into tension with other professional responsibilities.

Having carefully reviewed the record, the hearing officer's report, and the parties' briefs, we ultimately conclude, as we did with Respondent's duty-to-report, that under the circumstances of this case any criminality involved with Respondent's possession of these materials is not of a nature that reflects adversely on his honesty, trustworthiness, or fitness as a lawyer. This was not a situation where the attorney sought to satisfy his prurient interests by viewing child pornography, *see Matter of Raquet*, 870 N.E.2d 1048 (Ind. 2007), or by sexually exploiting a client's underage family member. *See Matter of Wood*, 489 N.E.2d 1189 (Ind. 1986). Nor are we persuaded by the Commission's argument that the circumstances surrounding Respondent's possession of these materials are analogous to *Matter of Schalk*, 985 N.E.2d 1092 (Ind. 2013), in which an attorney representing a client in a criminal matter enlisted two co-conspirators to purchase marijuana from a witness for the prosecution.

Our narrow conclusion that the requisite nexus between Respondent's alleged criminality and his fitness has not been proven clearly and convincingly should not be read as an endorsement of Respondent's conduct. The best course of action for all who took possession of these materials, including Respondent, would have been to promptly involve law enforcement. There was no legitimate reason not to do so here; this was a situation where one would have expected the school and the school's attorney to have overlapping interests with law enforcement in protecting children from a known predator. As one long-time detective testified, "I've never had a school not wish to provide information about a staff member who is committing violent and child seduction, like protect the kid, it didn't make sense to me[.]" (Tr. Vol. 1 at 270). The quandary in which Respondent found himself was an unnecessary one of his own making, borne of his and his client's misguided goals to cover up what Cox had done. That any adverse reflection upon Respondent's fitness in

this regard derives from this incompetence, and not from any criminality, does not excuse his poor handling of these materials.

**5.  Other allegations.** The Commission also argues in its petition for review that Respondent violated Rule 1.1 and/or Rule 8.4(d) in connection with his possession of child pornography, failure to directly report child abuse to DCS, interference of law enforcement, and advice to Miller in other respects. While some of these arguments have force, we need not separately address them, as we already have found violations of Rules 1.1 and 8.4(d) and our consideration of an appropriate sanction contemplates Respondent's conduct *in toto*.

**6.  Sanction.** Both parties have briefed extensively the question of appropriate sanction. Respondent urges that no more than a private reprimand be imposed, while the Commission asks us to suspend Respondent without automatic reinstatement. Under the circumstances of this case, we cannot accept either of these positions.

Respondent relies on several of the American Bar Association's Standards for Imposing Lawyer Sanctions, to which we frequently turn for guidance. *See Matter of Hollander*, 27 N.E.3d 278, 280 (Ind. 2015). In particular, Respondent cites Standard 1.2, which provides that private discipline may be appropriate "in cases of minor misconduct, when there is little or no injury to a client, the public, the legal system, or the profession[.]" While we have no quarrel with this general proposition, it has no bearing here. Respondent's misconduct was not minor; he incompetently represented a client and prejudiced the administration of justice by attempting to silence a child solicitation victim and her family. There was substantial reputational and legal injury suffered by his client; and although Park Tudor certainly bears its own share of responsibility for that injury, Respondent's misconduct was a direct contributing factor. Finally, while public injury thankfully was mitigated by the extraordinary efforts of law enforcement in this case, we cannot ignore that the logical outcome of Respondent's misguided actions would have been to shield Cox from accountability and enable him to victimize other children.

On the other side of the ledger, the Commission's request for suspension without automatic reinstatement depends heavily on two

faulty premises; first, that Respondent committed all the rule violations with which he was charged, particularly those involving criminality, and second, that Respondent lacks insight or remorse because he has not acknowledged any misconduct. Respondent was entitled to mount a good-faith defense to the charges against him and has done so. Many of the issues presented in this case are difficult ones, Respondent has prevailed on several of his arguments, and we do not view his failure to prevail on others as an aggravating factor. Once these faulty premises are set aside, none of the remaining factors relevant to sanction (which we discuss below) are of a quality that ordinarily would prompt us to require an attorney to undergo the reinstatement process in order to resume the practice of law. *See Hill*, 144 N.E.3d at 196.

This leaves us to weigh a public reprimand or short suspension with automatic reinstatement. Weighing heavily in Respondent's favor are his lack of prior discipline in over four decades of practice, the unique challenges presented in this matter, the absence of a selfish motive for his misconduct, and the absence of a broader pattern of misconduct extending beyond this single case. Respondent's substantial experience in the practice of law also weighs against him though, because it counsels he should have known better than to chart the path he did. And weighing most heavily against Respondent is the nature of his misconduct, which sought to silence a fifteen-year-old crime victim and frustrate law enforcement, and the fact Respondent's misconduct was a contributing factor to the harm suffered by his client when this misguided wall of secrecy came crashing down.

After careful consideration, we conclude that the balance of factors relevant to professional sanction weighs slightly in Respondent's favor, and we agree with the hearing officer's recommendation that under the circumstances present here a public reprimand is sufficient discipline for Respondent's misconduct.

# Conclusion

The Court concludes that Respondent violated Indiana Professional Conduct Rules 1.1 and 8.4(d). For Respondent's professional misconduct, the Court imposes a public reprimand. The costs of this proceeding are assessed against Respondent, and the hearing officer appointed in this case is discharged with the Court's appreciation.

Rush, C.J., and David, Massa, and Goff, JJ., concur.
Slaughter, J., concurs in part and dissents in part with separate opinion.

ATTORNEYS FOR RESPONDENT
Theodore R. Boehm
Wayne C. Turner
Riley H. Floyd
Indianapolis, Indiana

ATTORNEYS FOR INDIANA SUPREME COURT
DISCIPLINARY COMMISSION
G. Michael Witte, Executive Director
Seth T. Pruden, Staff Attorney
Julie Bennett, Staff Attorney
Indianapolis, Indiana

**Slaughter, J., concurring in part, dissenting in part.**

Unlike the Court, I would find that Respondent, Michael A. Blickman, did not violate Rules of Professional Conduct 1.1 and 8.4(d) while representing Park Tudor School and thus warrants no sanction. I concur in Parts 2 through 5 of the Court's opinion and respectfully dissent from Parts 1 and 6.

I

Under Indiana Rule of Professional Conduct 1.1, a lawyer must "provide competent representation to a client." The hearing officer found, and the Court agrees, that Blickman violated this rule, concluding that his representation of the School was incompetent. This conclusion is based on Blickman's drafting a proposed settlement agreement with a confidentiality provision. The hearing officer made three relevant findings concerning the settlement agreement:

1. When Blickman drafted the agreement, he thought Park Tudor had observed its reporting obligation to the Department of Child Services.
2. Blickman reasonably believed that both the family and Park Tudor sought confidentiality.
3. As a result of this "shared goal", Blickman drafted the proposed settlement agreement with a confidentiality provision similar to provisions he had used in other employment matters.

The Court does not refute these findings but nonetheless concludes that the proposed agreement tried to "silence" the student and her family, so they would not cooperate further with government authorities. *Ante*, at 7. Characterizing Blickman's use of a confidentiality clause as an inappropriate attempt to silence the family ignores that Blickman drafted the provision based on his reasonable belief that it served the parties' "shared goal" of keeping this matter confidential. And, in any event, it is far from clear that including a confidentiality provision in a contract is contrary to existing law—and thus would warrant today's conclusion that the lawyer provided incompetent representation. I am aware of no authority holding that, and the Court cites none. Even the hearing officer

recognized that the confidentiality clause Blickman used was one he had used in other matters without incurring professional sanction.

If Blickman's conduct rested on a viable legal basis, then I see no grounds to find that he was incompetent under Rule 1.1, which says that "[c]ompetent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." But the Court's conclusions, adopted from the hearing officer's report, do not implicate Blickman's legal knowledge, skill, thoroughness, or preparation. Instead, the Court finds Blickman incompetent for trying to effectuate his client's wishes in a way that relied on, at worst, an unproven legal basis.

Though unproven in this context, Blickman's proposed use of a settlement agreement with a confidentiality provision for the mutual benefit of all parties is common when addressing workplace issues generally. In a typical employment dispute, Blickman's approach would raise no eyebrows. But Blickman's conduct, it seems, is being censured here because the case involves a minor. Yet even the most competent lawyer cannot guarantee the outcome of an untested legal position until a court decides the issue. Perhaps a court could find the difference here enough to distinguish these facts from a typical case. Perhaps a court could find a key difference based on mandatory reporting requirements in situations involving children. And, ultimately, perhaps a court could have invalidated the settlement agreement or the confidentiality provision, assuming the parties had executed them. But Blickman should not be held incompetent for conduct not at odds with prevailing law.

When the issue is incompetent representation, we ask whether the lawyer's "actions show a major deviation from minimum professional standards." *Matter of Rabb*, 704 N.E.2d 117, 118 (Ind. 1998). Consider examples of behavior we have previously sanctioned under Rule 1.1 as major deviations from prevailing standards:

- a lawyer lied about a judge in an appellate brief, *Matter of Becker*, 620 N.E.2d 691, 693 (Ind. 1993);

- a lawyer with active matters closed his practice with no notice to his clients, *Matter of Comer*, 648 N.E.2d 358, 358–59 (Ind. 1995); and
- a lawyer failed to file his client's claim for five years, resulting in the statute of limitations barring the claim. *Matter of Rabb*, 704 N.E.2d at 118.

In each of these cases, the lawyer lacked sufficient knowledge, skill, thoroughness, or preparation. For instance, judges and lawyers for decades have cautioned against resorting to lies or ad hominem attacks against judges, and it is common knowledge that engaging in such tactics is likely to prejudice a client's case. See, e.g., Roger J. Miner, *Twenty-Five "Dos" for Appellate Brief Writers*, 1 Scribes J. Legal Writing 19, 24–25 (1992) ("Attacks in the brief on brothers and sisters at the bar rarely bring you anything but condemnation by an appellate court. . . . And never, *never* attack the trial judge!"). Similarly, even minimally competent lawyers must have the thoroughness and preparation to advise their clients they will need new representation if the lawyer closes a practice or to recognize that a five-year statute-of-limitations deadline is approaching. These cases underscore that professional incompetence is not merely unsavory conduct but a major deviation from minimum professional standards. Yet today's decision departs from this major-deviation yardstick and sanctions Blickman for conduct—trying to include a confidentiality provision in a settlement agreement—that not only does not violate our precedent but is common practice in the profession.

The Court also finds that Blickman was incompetent for subjecting the School to reputational harm and criminal exposure. But this view mistakes both the facts and our legal standard for competence. Factually, the Court cites Blickman's conduct as a "significant contributing factor" for the deferred-prosecution agreement between the School and the Department of Justice. *Ante*, at 8. But the deferred-prosecution agreement makes only brief mention of the confidentiality provision, stating in its entirety: "Beginning on December 16, 2015, the Park Tudor Head of School authorized Park Tudor's outside counsel to negotiate a confidentiality agreement with Minor Victim 1's parents." The deferred-prosecution agreement never says that Blickman's conduct exposed the School to

reputational harm or criminal exposure. In fact, the agreement focuses not on Blickman's conduct, but on that of Miller, the head of school. No fair reading of this agreement supports the view that Blickman, by drafting the confidentiality provision or reminding the student's father about the provision, subjected the School to greater reputational harm or criminal liability than that already caused by the reprehensible actions of Cox, the offending teacher, or Miller.

And, legally, a lawyer's competence is not judged by whether the client's position subjects it to reputational harm or criminal liability. Clients through their counsel often explore legal options that may run the risk of liability or other harm. The proper inquiry under Rule 1.1 is whether Blickman, in representing Park Tudor, neglected his legal knowledge, skill, thoroughness, or preparedness to such a degree that he failed to meet even minimum professional standards. I would hold he did not.

Finally, the Court agrees with the hearing officer that Blickman's efforts to negotiate a confidentiality provision with the family's lawyer were "pure and simple against public policy." *Ante*, at 8. There is no doubt that protecting children from predatory teachers and from those who look the other way in the face of such conduct is a compelling public-policy interest. But even assuming that Blickman's conduct was against public policy, this is not the proper benchmark for assessing a Rule 1.1 violation. And by using such a benchmark, today's decision may have serious consequences for other lawyers.

Transactional lawyers who negotiate contract provisions held to be unenforceable on public-policy grounds may now face professional sanction, because it is not uncommon for courts to invalidate provisions within commercial contracts. See, e.g., *Am. Consulting, Inc. v. Hannum Wagle & Cline Eng'g, Inc.*, 136 N.E.3d 208, 214 (Ind. 2019) (invalidating liquidated-damages clause); *Cent. Ind. Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 730 (Ind. 2008) (rejecting geographic limitation in noncompetition agreement); *Cincinnati Ins. Co. v. Trosky*, 918 N.E.2d 1, 10 (Ind. Ct. App. 2009) (severing exclusion of government vehicle from underinsured-motorist provision); *Ransburg v. Richards*, 770 N.E.2d 393, 403 (Ind. Ct.

App. 2002) (voiding exculpatory clause in residential lease). Today's decision threatens lawyers who draft provisions held to be unenforceable because contrary to public policy.

The decision may also affect criminal-defense lawyers. Claims that trial or appellate counsel failed to provide the minimal level of competence required by the Sixth Amendment are a dime-a-dozen. After today's decision, it is not hard to imagine that a judicial finding (or even a plausible allegation) that counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), will trigger a disciplinary complaint. Given the Court's reasoning that Blickman's conduct "was a significant contributing factor to the reputational harm and criminal exposure suffered by his client", *ante*, at 8, it appears this precise rationale would likewise apply to a lawyer found or alleged to be ineffective under *Strickland*.

The same appears true of prosecuting attorneys and their appellate counterparts in the attorney general's office. If their subpar performance costs the State a conviction, or if they rely on an unsettled yet defensible legal basis and lose, they too may be subject to professional discipline.

Rather than resorting to professional discipline charged by our commission and meted out by our Court, I would leave it to the marketplace to punish lawyers who are not up to snuff. Or, at the very least, I would observe our own precedent and sanction only conduct that clearly fails to meet even minimal competency standards.

## II

Rule 8.4 says "it is professional misconduct for a lawyer to", among other things, "engage in conduct that is prejudicial to the administration of justice". Prof. Cond. R. 8.4(d) (cleaned up). Although the Court finds that Blickman violated Rule 8.4(d), the hearing officer found otherwise. The record supports the hearing officer's finding, and I would hold that Blickman did not violate this rule. In my view, the Court errs by equating a lawyer's competence with whether the lawyer's conduct prejudiced the administration of justice: "The same facts and conclusions cited by the hearing officer in this regard also point to a Rule 8.4(d) violation". *Ante*, at

8. The Court's analysis overlooks that Rules 1.1 and 8.4(d) govern different misconduct.

Under Rule 8.4(d), conduct is "prejudicial to the administration of justice" when the lawyer impedes judicial proceedings by acting in bad faith and without a legal basis. This is true in both cases the Court cites. In *Matter of Campanella*, 56 N.E.3d 631, 632 (Ind. 2016), a lawyer threatened treble damages in open court during a small-claims case despite knowing that the client had no additional damages. And, later, in a separate suit over a used vehicle's trade-in value, the lawyer demanded $200,000,000 and threatened to file a disciplinary grievance against opposing counsel if the demand was not met. *Id.* at 632–33. Such conduct, we held, was prejudicial to the administration of justice. Likewise, in *Matter of Halpin*, 53 N.E.3d 405, 406 (Ind. 2015), a lawyer in a paternity action threatened to file unfounded disciplinary charges against opposing counsel if counsel did not consent to a venue change. The lawyer also included ad hominem attacks against the judge in a motion to the court. *Id.* Again, we held that this conduct prejudiced the administration of justice. In contrast, Blickman's conduct was miles apart from that in *Campanella* and *Halpin*. During the alleged misconduct here, there was no judicial proceeding, no court to impede, no judge to defame, and no baseless claim, motion, or threat of disciplinary action.

Despite these differences, the Court concludes that Blickman's conduct was prejudicial, in part, because it might have helped Cox avoid prosecution or work for another school. Although either outcome would be undesirable, there is nothing inherently unlawful or automatically prejudicial to the administration of justice, and the Court cites no authority for its premise that a proposed confidentiality provision amounts to either. Instead, the Court simply recites that such conduct is contrary to "public policy" and "subvert[s] justice." *Ante*, at 9.

Yet it takes two to tango. Blickman was not negotiating these terms in isolation. His counterpart, the family's lawyer, also sought confidentiality for his own client and was negotiating settlement terms with Blickman to effectuate that goal. For reasons known only to the commission, the family's lawyer was not the subject of a disciplinary complaint. Unlike

Blickman, he was spared the expense and embarrassment of defending his conduct and professional reputation. If the proposed confidentiality provision were so clearly at odds with public policy and justice, why weren't both lawyers in the commission's crosshairs? Today's decision provides no answer and no clear guidance for lawyers who wish to stay on the right side of the commission. At the same time, it puts a broad swath of Indiana's practicing lawyers, otherwise in good standing and observing professional norms, at risk of professional sanction.

For these reasons, I respectfully concur in part and dissent in part.